PENN MUT. LIFE INS. CO. v. MECHANICS' SAVINGS BANK & TRUST CO.

(Circuit Court of Appeals, Sixth Circuit. February 4, 1896.)

No. 343.

1. LIFE INSURANCE—CONFLICT OF LAWS—PLACE OF CONTRACT.

A life insurance policy issued upon an application which is made part thereof, and which expressly provides that "the place of the contract shall be the city of Philadelphia, state of Pennsylvania," is to be governed by the laws of Pennsylvania, though the insured was a resident of Tennessee at the time of making the application.

2. SAME—APPLICATION—FALSE STATEMENTS—MATERIALITY.

A state statute providing that no misrepresentations or unproved statements of the applicant, made in good faith, shall effect a forfeiture, or be ground of defense, unless the same relate to some matter material to the risk (Act Pa. June 23, 1885), is remedial in its nature, and within the police power of the state.

3. SAME—CONSTRUCTION OF STATUTE—MATERIALITY OF REPRESENTATION.

The effect of such a statute is to leave open to judicial investigation, in the ordinary way, the question whether any fact concerning which inquiry was made, and an untrue answer given, was material to the risk. If found to be material, the policy will be avoided, whether the untrue answer was made in good faith or not. If found not to be material, then the breach of warranty will work no prejudice to the insured, if the answer was given in good faith; but if given in bad faith, and for the purpose of misleading the company, then the policy will be avoided, notwithstanding the immateriality of the fact inquired about.

4. SAME—REPRESENTATIONS AS TO OTHER INSURANCE—MUTUAL AID ASSOCIATIONS.

A question in an application, as to whether the applicant has his life insured "in this or any other company? (If so, give the name of each company, and the kind and amount of the policy)," does not include insurance in mutual benefit associations, and a failure to disclose such insurance is not a misrepresentation.

5. SAME.

It is not a true answer to such a question merely to name some of the regular insurance companies in which the applicant has other insurance, omitting to name others. Such an answer necessarily implies that there is no other insurance than that stated, and if there is other insurance the answer is false.

6. SAME—EVIDENCE AS TO BAD FAITH—FALSE STATEMENTS IN OTHER APPLICATIONS.

In determining whether a false statement in respect to other insurance was made innocently or not, it is competent to show that, in answers to similar questions in applications for other policies, the insured made answers equally untrue. Nor is the relevancy of such answers destroyed by the fact that they were given subsequent to the application in question, though the possibility that the fraudulent intent present in them might have been formed after an innocent mistake affects their probative force.

7. SAME—MATERIALITY OF FALSE STATEMENTS—EXPERT EVIDENCE.

By the weight of authority in this country, an insurance expert cannot be asked his own opinion whether an undisclosed or misrepresented fact is or is not material to the risk; but he may be asked concerning the usage of insurance companies generally in respect to charging higher rates of premium, or in rejecting risks, when made aware of the particular fact in question. This rule is applicable to life insurance when the question relates to one of a class of facts which life insurance companies are frequently required to consider in relation to the acceptance of risks, so that the witness may base his answer on a well-defined practice of such companies; but care must be taken that he shall not substitute his

own opinion, or that of his own company only (neither of which is relevant), for the usage of companies generally. As the modern practice of life insurance companies seems to be not to vary the premium, except for age, and either to accept risks of the same age, or reject them altogether, the question should, in such cases, be limited to whether insurance companies generally, if made aware of the undisclosed fact, would reject the risk.

**8. Same—Questions for Jury.**

The question of the materiality of a fact in respect to which false statements have been made is always for the jury, unless the answers in the application are expressly made the basis of the contract; and even in the latter case the question is for the jury where the statute declares that innocent misrepresentations in relation to matters not material to the risk shall constitute no defense. Act Pa. June 23, 1885; Society v. Llewellyn, 16 U. S. App. 405, 7 C. C. A. 579, 58 Fed. 940, explained.

**9. Same.—Concealments of Diseases.**

Whether mere temporary ailments or affections, such as sore throat, chancroid, indigestion, etc., are to be regarded as diseases, within the meaning of the policy, so that a failure to disclose them is a misrepresentation or concealment of a material fact, is a question for the jury.

**10. Same—Statements as to Occupation.**

A question as to the occupation of an applicant for insurance, being truly answered by the statement that he is a bank teller, does not require him to further disclose that he is an habitual embezzler. The embezzling is merely a misfeasance in his position as teller, and not an occupation in itself. New York Bowery Fire Ins. Co. v. New York Fire Ins. Co., 17 Wend. 359, and Sun Mut. Ins. Co. v. Ocean Ins. Co., 1 Sup. Ct. 582, 107 U. S. 485, followed.

**11. Same—General Provision as to Disclosures.**

A general statement in the application that no circumstances or information has been withheld, touching the applicant's past and present state of health and habits of life, with which the insurance company ought to be made acquainted, refers only to the questions and answers in the application, and is equivalent to a warranty that such answers are full and complete. Such statement does not refer to thefts or embezzlements of which the applicant may have been guilty, but concerning which no inquiry was made.

**12. Same—Duty as to Voluntary Disclosures.**

The strict rule enforced in cases of marine insurance, requiring full disclosure of all material matters, and avoiding the policy, even in cases of suppression through mistake, is not applicable, according to the weight of authority in this country, to cases of life insurance. An applicant for life insurance, who has fully and truthfully answered all the questions put to him, may rightfully assume that the range of the examination has covered all matters deemed material by the insurer, and is not required to search his memory for circumstances of possible materiality not inquired about. All that is required is that there shall be no suppression in bad faith, with intent to mislead the insurer.

**13. Same—Burden of Proof as to Materiality.**

The burden of proof to establish the materiality of a misrepresentation or concealment, as well as the fraudulent intent, where that is necessary, is on the defendant. Nor is the burden shifted where it is admitted that the insured made an untrue answer concerning other insurance; for, if there be a presumption that his failure to mention it was intentional, this is met by the presumption that a man does not make a fraudulent misstatement, and the question is therefore for the jury, upon all the evidence.

In Error to the Circuit Court of the United States for the Middle District of Tennessee.

This action was on a policy of insurance for $10,000 issued December 2, 1892, by the Penn Mutual Life Insurance Company to John Schardt, on his

own life. Schardt died April 17, 1893, during the currency of the policy. Just before his death he had assigned the policy to the Mechanics' Savings Bank of Nashville, to secure a large debt owed by him to the bank. Since his death the bank has made a general assignment for the benefit of creditors to J. J. Pryor, for whose benefit, as assignee, this suit was brought. The trial resulted in a judgment for the full amount of the policy and interest, in favor of the plaintiff below, and the insurance company brings the judgment here for review on writ of error. The defendant filed 19 pleas to the declaration, averring that both by misrepresentation of facts warranted to be true in the application and policy, and by concealment of a fact material to the risk, the policy was avoided.

The opening words of the policy were:

"In consideration of the application for this policy, which is hereby made a part of this contract (a copy of which is hereto attached), and of the payment by John Schardt of the premiums as hereinafter provided, the Penn Mutual Life Insurance Co. hereby promises to pay at its home office, in the city of Philadelphia, Pennsylvania," etc.

The questions and answers in the application which are material to the controversy here were as follows:

"1, A. Give your name in full and post-office address? A. John Schardt, Nashville, Tenn.

"B. Present and previous occupations? (State kind of business.) B. Present teller in Mechanics' Bank. Previous, same."

"6, A. Have you your life insured in this or any other company? (If so, give the name of each company, and the kind and amount of each policy.) A. Yes; $10,000 in Northwestern, 20 pay life; $5,000 in Aetna; $1,000 in N. Y. Mutual Life, renewable term."

After these answers this statement was signed by the applicant:

"I hereby warrant and agree, that I am temperate in my habits, now in good health, and ordinarily enjoy good health, and that in the statements and answers in this application no circumstance or information has been withheld touching my past and present state of health and habits of life, with which the Penn Mutual Life Insurance Company ought to be made acquainted; * * * and that the statements and answers to the printed questions above, together with this declaration, as well as those to be made to the company's medical examiner, shall constitute the application, and be the basis of this contract, and the place of contract shall be the city of Philadelphia, state of Pennsylvania."

Then followed the medical examination of the insured, of which only the questions and answers given below have a bearing on the issues in this case:

"*9, A. How long since were you attended by a physician or professionally consulted one? *A. A year.

"B. For what disease? *B. A cold.

"C. Give the name and residence of such physician? C. Dr. T. E. Enloe, Nashville, Tenn."

"11, A. Do you now use intoxicating liquors? A. None whatever."

"C. Have you always been temperate in their use? (If not, explain the duration and extent of excess, and when last.) C. Yes.

"12. A. Have you ever used opium, morphia, chloral, or any narcotic, unless regularly prescribed by a physician? (If so, explain fully.) A. No.

"B. Have you had asthma, consumption, spitting of blood, habitual cough and expectoration, palpitation, or any disease of the throat, heart or lungs? B. None except—No.

"C. Have you ever had cancer or any tumor, chronic diarrhœa, discharge from the ear, dropsy, fistula, gall stones or gravel, open sores, inflammatory rheumatism, gout, syphilis or stricture, or any disease of the liver, kidneys, or bladder? C. None except—No."

"14. Have you had any illness or disease other than as stated by you above? (If so, state full particulars.) No.

"Give here particulars as to date, duration, severity, etc., of each disease you have had.

"*Explain fully 9, A and B.

"None. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"It is hereby agreed: That all the foregoing statements and answers made to the company's medical examiner are warranted to be true and are offered to the company as a consideration of the contract."

It was conceded that at the date of the application Schardt had a policy for $5,000 in the New York Life Insurance Company, which he failed to mention. In order to show an intent on his part to deceive by this omission, defendant offered to show that in applications for policies in other companies for $25,000 each, made by him, one in February, 1893, and the other early in March following, he had also untruly stated the amount of existing insurance on his life. This offer was rejected by the court. Schardt's salary as teller was $1,500, and he had but a small amount of property. When he died in April, 1893, he had $80,000 of insurance on his life, nearly all of which had been written within six months. It was conceded that, for more than a year prior to his death, Schardt had been constantly embezzling the funds of his bank, and that his indebtedness to the bank thus criminally incurred amounted at the time of the application for this policy to little less than $100,000, and at his death exceeded that sum. He did not disclose the fact of his crime to the defendant at the time of his application, or at any other time. His death in April, 1893, was caused by congestion of the brain and other vital organs, caused by the mental strain which a disclosure of his crime brought on. Defendant introduced evidence tending to show that, six years before the application, Schardt had had the syphilis, a venereal and constitutional disease; that thereafter he had sore throat, due to syphilis; and that in 1892 he had had the gonorrhea, a venereal disease. In rebuttal, plaintiff adduced evidence making it probable that Schardt did not have the syphilis, but only a local sore, difficult to distinguish from the first symptom of syphilis, called a "chancroid," which was of no seriousness as a disease; that its resemblance to syphilis in the first stages induced a treatment for syphilis; that the result of such treatment was a cauterization of the throat, and a subsequent local inflammation of the throat; that Schardt then changed his physician, and employed Dr. Enloe, the one named in the application, who became the regular physician of himself and family during the next six years until his death, and during this period treated him for this throat trouble, and for indigestion, at times. Evidence was introduced by plaintiff tending to rebut testimony for defendant that Schardt was afflicted with gonorrhea in 1892. Defendant called insurance experts to testify in regard to the materiality of the facts in respect to which it was claimed that Schardt had been guilty of misrepresentation or concealment. The court permitted the experts to say whether, in their opinions, the facts misstated or concealed were material, but refused to allow them to say whether, by the usage of all insurance companies, such facts were regarded as material to the risk.

The defendant requested the court to instruct the jury to bring in a verdict for the defendant because it appeared by the undisputed evidence that Schardt's warranties of the truth of his representations in regard to facts material as a matter of law had been broken, and the policy avoided, in the following particulars, to wit: First, in that the amount of existing insurance of his life was greater than stated; second, in that he had had the syphilis; third, in that he had had a sore throat; fourth, in that he had had a chancroid; fifth, in that he had had indigestion; sixth, in that his occupation was that of an embezzler, as well as bank teller. Defendant asked the same instruction on the ground that Schardt had concealed from it and its agents the fact that he was an embezzler in the sum of $100,000,—a fact claimed to be material to the risk, as a matter of law. These requests were refused by the trial court on one ground, among others, that by the terms of the policy this was a Pennsylvania contract, and was to be construed in the light of a statute of that state which made the effect of a breach of these warranties in avoiding the policy to depend on the materiality of the fact misrepresented, or the good faith of the applicant, and that under such a construction the materiality of the fact misstated was a question for the jury, and so, also, was the good faith of the applicant. The court charged the jury that the plaintiff was entitled to recover the amount of the policy unless the defendant could show that Schardt had made untrue statements, and that the facts thus misrepresented were material to the risk, or that they had been misrepresented with intent to deceive the company, and that the burden of es-

tablishing these defenses was on the defendant. The court accordingly submitted to the jury the question whether the fact that Schardt had a policy in the New York Life Insurance Company was material to the risk, and, if not material, whether the omission by Schardt to include it in his answer was in good faith. He took the same course with respect to the other representations, leaving the question of their untruth, materiality, and good faith to the jury. The defendant excepted to so much of the charge as imposed upon the defendant the burden of showing that Schardt's failure to include in his existing insurance the New York Life policy was with intent to defraud, or that it was material to the risk, and requested upon this subject the following charge, which the court refused: "The undisputed evidence shows that Schardt omitted to disclose, in his answer to question 6, A, that, in addition to the insurance therein stated, he had been insured, and was then insured, and had a policy, in the New York Life Insurance Company, for five thousand dollars, which it was his duty to have done. The presumption is that he knew of this additional insurance. In fact, it is not controverted that he did. The presumption, also, is that he intentionally suppressed the fact. The presumption, also, is that the question, answer, and information sought by the question, as well that disclosed as that suppressed, were material. The defendant makes out a prima facie defense by referring to the question and answer, and proving the omission to state in his answer the policy in the New York Life Insurance Company; and the burden is on the plaintiff to show that the omission was not intentional, and that the matter suppressed was not material." Upon the question of concealment of the fact, the court charged the jury as follows: "It is again insisted, as the court understands the line of defense, that, in addition to the answers which it is alleged are false, that the insured concealed from the insurance company a fact about which he was not asked in the policy, and that by reason of that concealment the policy is avoided. That fact is that he was at the time a defaulter to the bank of which he was an officer. Now, it is not insisted that this is a false answer to anything asked here, because in the policy and in the application there is no answer made upon that point at all; and, in the absence of any answer at all upon the point, it constitutes no part of the written application or policy, and is therefore not governed by the same rule as stated to you as governing the other propositions. If the answers to the written questions were false and material, as explained to you, that would avoid the policy, without more, but in respect to a fact about which no question is asked, in order that the concealment from the company of such a fact as that should avoid the policy, it must have been intentionally concealed; and the omission to state it because the insured did not think it material, or the entire omission to speak of it because not asked about it, or because it was at the time not recollected or was forgotten, or its omission in any manner in good faith, would not avoid the policy. For the concealment of a fact such as that, outside of anything asked in the policy to have that effect, as stated, it must have been intentional." To this action of the court the defendant took the following exceptions: "(4) Said counsel next then and there excepted to so much of said charge as instructs the jury that before the failure of John Schardt, the insured, to disclose to the defendant company the fact of his defalcation to the plaintiff bank, at the time of the application and policy in question, could be available as a defense to his action, the concealment must have been intentional on the part of the said insured, and that, if his failure to divulge the fact arose from any of the causes stated in said charge, that such defense could not be established; and said counsel, insisting that the purpose, design, or intention of the insured in withholding the fact from the knowledge of the company is not material in making out said defense, except to the opinion of the court in its decision to the contrary."

F. C. Maury and J. B. Daniel, for plaintiff in error.

M. T. Bryan, E. H. East, and Vertrees & Vertrees, for defendants in error.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge (after stating the facts as above). There can be no doubt that this policy is to be construed according to the law of Pennsylvania. It is expressly provided in the application, which is made part of the policy, that "the place of contract shall be the city of Philadelphia, state of Pennsylvania." In Wayman v. Southard, 10 Wheat. 1–48, Chief Justice Marshall stated it to be a principle of universal law that "in every forum a contract is governed by the law with a view to which it is made." See Pritchard v. Norton, 106 U. S. 124, 136, 1 Sup. Ct. 102, and cases there cited. In this case no necessity exists for presumption from the circumstances, because the intention of the parties is express.

An act of the legislature of Pennsylvania passed June 23, 1885, provides that:

"Whenever the application for a policy of life insurance contains a warranty of the truth of the answers therein contained, no misrepresentation or untrue statement in such application, made in good faith by the applicant shall effect a forfeiture or be a ground of defense in any suit brought upon any policy of insurance issued upon the faith of such application unless such misrepresentation or untrue statement relate to some matter material to the risk."

At common law it is held that the warranty of the truth of the answer to a specific inquiry in the application implies the agreement that the subject-matter of the question and answer is to be regarded as material, and that an untrue answer thus warranted avoids the policy, whether the answer be made in good faith or not. Anderson v. Fitzgerald, 4 H. L. Cas. 484. It is contended by counsel for the insurance company that the same mode of determining the materiality of representations must obtain under this statute. If so, then it is difficult to see what change the statute was intended to effect, because every matter warranted would be material, and the good faith in the statement would remain of as little importance as it did without the statute. This is one of a class of statutes passed in many states to relieve against the hardships arising from the strict enforcement at common law of warranties in insurance policies concerning matters having no real or proximate relation to the risk assumed by the insurer. By the aid of such warranties, and the innocent mistakes of the insured, it often happened that the insurer was able to escape liability on a ground having no real merit, and of the purest technicality. That such statutes are remedial in their nature, and are quite within the police power of the legislature, is no longer a debatable question. White v. Insurance Co., 4 Dill. 177, Fed. Cas. No. 17,545; Society v. Clements, 140 U. S. 226, 11 Sup. Ct. 822; Wall v. Assurance Soc., 32 Fed. 273; Eagle Ins. Co. of Cincinnati v. State, 153 U. S. 446, 14 Sup. Ct. 868; Reilly v. Insurance Co., 43 Wis. 449; Insurance Co. v. Leslie, 47 Ohio St. 409, 24 N. E. 1072; 4 Thomp. Corp. §§ 5491, 5524. As the statute was passed to prevent defeat of the policy by mere stringency of stipulation, a reasonable interpretation of it will not permit the mere fact of warranty in form to render every statement of fact material to the risk. Its manifest purpose was to leave open to ju-

dicial investigation in the ordinary way the question whether the fact concerning which inquiry was made, and an untrue answer given, was material to the risk. If it is in this manner found to be material, then the plain implication of the statute is that the usual penalty for breach of insurance condition and warranty shall follow, and the policy be avoided, whether the answer be made in good faith or not. If, however, the question untruly answered relates to something not found to be material to the risk, and if the answer is in good faith, then the breach of warranty works no prejudice to the insured or his representatives. If, though the question untruly answered relates to something not directly material to the risk, the untrue answer is made in bad faith,—that is, with a knowledge of its falsity, and for the purpose of misleading the company into the contract,—the implication of the statute is that the rule at common law shall prevail, and the policy shall be avoided. The statute has been construed by the supreme court of Pennsylvania, and our conclusions above stated are in accordance with the views of that court. Hermany v. Association, 151 Pa. St. 17, 24 Atl. 1064. In that case the court say (page 23, 151 Pa. St., and page 1064, 24 Atl.):

"This act has effected a change in life insurance contracts,—a much-needed change so far as some companies are concerned. The questions of materiality and good faith are ordinarily questions of fact, and therefore for the jury. They were certainly so in this case." "The evident purpose of this legislation was to strike down, in this class of cases, literal warranties, so far as they may be resorted to for the disreputable purpose of enforcing actually immaterial matters. It provides a rule of construction for the purpose of preventing injustice, and it is as much the duty of courts to enforce such rules as it is to administer the statute of frauds and perjuries."

The construction of a state statute by the highest court of the state is usually authoritative in courts of the United States. Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10. And, even if it were otherwise, we should reach the same conclusion in this case. The court of appeals of Maryland has had occasion to construe this same statute, and has given it a like interpretation. Association v. Ficklin, 74 Md. 172, 21 Atl. 680, and 23 Atl. 197.

Having settled the construction of the statute, we come now to the questions of evidence. The circuit court was right in holding that within the scope of the question, "Have you your life insured in this or any other company? (If so, give the name of each company and the kind and amount of the policy)," were not included Schardt's certificates of insurance in the Knights of Pythias and Royal Arcanum Mutual Aid Associations. It will be conceded that these associations, which are primarily for social and charitable purposes, and for securing efficient mutual aid among their members, are not usually described as insurance companies. That the certificate which they issue to a member, insuring upon certain conditions the payment of a sum certain to the member's representatives on his death, has much resemblance in form, purpose, and effect to an insurance policy, is true; and, if we were called upon to give the application a wide and liberal construction

in favor of the insurance company, we might properly hold that the question embraced in its scope every association or individual contracting to pay money to one's representatives in the event of his death. Such a construction might be warranted by the probable purpose of the question to enable the company to judge how great a motive his life insurance would furnish the applicant for self-destruction, or the fraudulent simulation of death. But we are here considering a contract and application drawn with great nicety by the insurance company, and framed with the sole purpose of eliciting from the insured full information of all the circumstances which the company's long experience has led it to believe to be valuable in calculating the risk. We cannot presume the company to have been ignorant of the fact that large numbers of persons have taken out life insurance in mutual benefit associations which are not ordinarily described as insurance companies, and that doubt has often arisen whether the contracts they issue are properly or technically described as life insurance at all. Insurance Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. 87. Having in view the well-established rule that insurance contracts are to be construed against those who frame them (Indemnity Co. v. Dorgan, 16 U. S. App. 290, 309, 7 C. C. A. 581, 58 Fed. 945; Insurance Co. v. Crandal, 120 U. S. 527, 533, 7 Sup. Ct. 685), and that any doubt or ambiguity in them is to be resolved in favor of the insured, we conclude that a certificate in a mutual benefit and social society was not within the description, "policy of life insurance in any other company." We are fortified in the conclusion by the fact that this contract is a Pennsylvania contract, and the courts of that state have uniformly held that mutual aid associations and insurance companies are so clearly to be distinguished that statutes applying to insurance companies and their policies do not have application to mutual aid associations, and the certificates of life insurance which they issue to their members. In Dickinson v. Ancient Order United Workmen, 159 Pa. St. 258, 28 Atl. 293, the defendant association sought to avoid its certificate on the ground of misrepresentation in the application. The plaintiff objected to the introduction of the application because it had not been attached to the policy in accordance with the Pennsylvania statute which forbade the introduction by an insurance company, in defense of a suit on its contract of insurance, of an application not attached to the policy when issued. It was held that the statute did not apply, because the defendant association was not an insurance company, but belonged to the distinctly recognized class of organizations, known as "benevolent associations." See, also, Association v. Jones, 154 Pa. St. 99, 26 Atl. 253; Com. v. Equitable Ben. Ass'n, 137 Pa. St. 412, 18 Atl. 1112; Com. v. National Mut. Aid Ass'n, 94 Pa. St. 481; Lithgow v. Supreme Tent (Pa. Sup.) 30 Atl. 830; Theobald v. Supreme Lodge, 59 Mo. App. 87; Sparks v. Knight Templars, 1 Mo. App. Rep'r, 334. It is true that in other states it has been held that such associations are within the description of "insurance companies," and that the contracts they make are properly termed

"policies," as those terms are used in the statutes of such states. State v. Nichols, 78 Iowa, 747, 41 N. W. 4; Insurance Order v. Lewis, 12 Lea, 136; Assurance Fund v. Allen, 106 Ind. 594, 7 N. E. 317; Com. v. Wetherbee, 105 Mass. 159; Sherman v. Com., 82 Ky. 102. In this conflict of authority, we must lean towards the decisions of the state courts of that state, according to the laws of which we must construe this contract, and, for the reasons already given, hold that certificates of membership in mutual benefit benevolent associations were not embraced in the question asked by the company in that state.

We now come to the questions of evidence with respect to the \$5,000 policy in the New York Life Insurance Company which Schardt omitted in his answer to the question concerning other insurances. It is first insisted for the plaintiff below that his answer was not untrue. He was asked if he had other policies in other companies, and, if so, to state the companies and amount. It is urged that when he gave three such policies the question was answered correctly, and that his failure to give the fourth policy did not involve a false statement, but only left the answer incomplete, but true in everything stated. Several cases are cited to the point that such an answer is not a misrepresentation. In Perrine v. Society, 2 El. & El. 317, the applicant was asked what was his profession, and he answered that he was an "esquire." In fact, he was an ironmonger. It was held that there was no misrepresentation here, but, at the most, only a concealment or falsehood by implication; that the answer was true, as far as it went. The same ruling was made by the court of appeals of New York in Dilleber v. Insurance Co., 69 N. Y. 256. There the applicant was asked to state the physicians he had consulted in the last 10 years. He answered that he had consulted Dr. Paine 9 years before. In fact, he had also consulted another physician. It was held that, the answer being true as far as it went, there was no breach of the warranty; that the answer was full and true. We do not think that these cases can be supported. In Insurance Co. v. Raddin, 120 U. S. 183, 7 Sup. Ct. 500, the supreme court held that, where the answers to questions were obviously incomplete, the insurance company, by failing to inquire further before issuing the policy, waived any right to complain of such incompleteness; but the court clearly indicated its view that if such an answer was apparently complete, but in fact was otherwise, it was a false answer, and a breach of the warranty of its full truth. Towne v. Insurance Co., 7 Allen, 52, 53; London Assurance v. Mansel, 11 Ch. Div. 363; Bliss, Ins. (2d Ed.) 189, 190; Phil. Ins. §§ 550, 565, 567. The answer to such a question contains the necessary implication that there is no other insurance than that stated, and, if there is other insurance, it is as false as if the existence of other insurance were expressly denied. As already stated, any answer to a question, though concerning a matter not material to the risk, if made with intent to deceive the insurance company, would avoid the policy. Hence, even assuming that the question of other insurance was found by the jury to

be not material to the risk, the company still had a complete defense, if it could show that the answer had been made in bad faith. The intent of Schardt in omitting the New York Life policy, therefore, became a substantial issue, and evidence relevant to show his intent should have been admitted. The company offered to prove that, in answers to similar questions in applications for other policies, he had made answers equally untrue. We think this evidence was relevant and competent. It might have been forcibly argued on behalf of the defendant that Schardt had a motive to suppress the amount of other insurance, in the fear that, if the defendant knew all his then insurance, it would prompt inquiry into his purpose in carrying insurance in an amount out of proportion to his regular income of $1,500, upon which he was obliged to support a family, and would lead to a rejection of his application. And if the defendant could show a similar suppression of the same fact in the two applications for the later policies for $25,000 each, made within three months thereafter, when the same motive may be supposed to have been present, it would properly strengthen the argument that his suppression of the extent of his insurance in this case was with intent to conceal and deceive. Such evidence would have a tendency to show that his omission in the three cases was not by accident, but by design. It is a well-established rule of evidence that, where the issue is the fraud or innocence of one in doing an act having the effect to mislead another, it is relevant to show other similar acts of the same person having the same effect to mislead, at or about the same time, or connected with the same general subject-matter. The legal relevancy of such evidence is based on logical principles. It certainly diminishes the possibility that an innocent mistake was made in an untrue and misleading statement, to show similar but different misleading statements of the same person about the same matter, because it is less probable that one would make innocent mistakes of a false and misleading character in repeated instances than in one instance. Thus, where one was on trial for selling skimmed milk for fresh milk, in violation of the statute, it was held competent to show other instances of similar sales on other days by the accused about the same time, because, if he sold skimmed milk in repeated instances, it was rendered more probable that he knew its character in each instance. He might have made the mistake once, but not frequently. Bainbridge v. State, 30 Ohio St. 264. So, in this court, where the question was of the defendant's motive and knowledge in making statements concerning the character of a silver mine, we held it competent to show an elaborate and fraudulent scheme to mislead, not the plaintiff, but another, into the purchase of the mine, although the scheme was concocted and carried into attempted execution at least two years before the statements and sale to the plaintiffs. It was the circumstances that the acts related to the sale of the same mine, and that the motive for its sale might be presumed to continue, that removed the objection based on remoteness in point of time.

Mining Co. v. Watrous, 9 C. C. A. 415, 61 Fed. 163.    Judge Lurton, in delivering the opinion of the court in that case, said:

"It is not, in such a case, essential that these former acts of fraud were not contemporaneous with the transaction under inquiry. If they were frauds of like character, and especially if they concerned former efforts to sell the same property, they are admissible. Remoteness in point of time may weaken their evidential value, but will not ordinarily justify exclusion."

Judge Lurton cites in support of this view Ross v. Miner, 67 Mich. 410, 35 N. W. 60; Hoxie v. Insurance Co., 32 Conn. 21; Rafferty v. State, 91 Tenn. 655, 16 S. W. 728; Bottomley v. U. S., 1 Story, 136, Fed. Cas. No. 1,688; Jordan v. Osgood, 109 Mass. 461; Castle v. Bullard, 23 How. 174; Butler v. Watkins, 13 Wall. 457; Insurance Co. v. Armstrong, 117 U. S. 598, 6 Sup. Ct. 877; Blake v. Assurance Soc., 4 C. P. Div. 94. It would seem clear from the foregoing that the objection made by counsel for the plaintiff that the other false statements of other insurance were too remote in point of time is not tenable. But it is suggested that the fact that the instances sought to be proven were subsequent to the instance in issue destroys their relevancy, because the fraudulent intent present in them might have been formed after an innocent mistake. This possibility, of course, affects the probative force of these subsequent instances to show fraud, but we do not think it makes them inadmissible. In Wood v. U. S., 16 Pet. 342, the question was whether there had been fraud in invoicing importations under the customs revenue law. It was objected that, while similar undervaluations in other importations prior to the one in issue might be admissible, still it was error to admit such undervaluations in later importations. To this, Mr. Justice Story, speaking for the court, said:

"The other objection has as little foundation, for fraud in the first importation, may be as fairly deducible from other subsequent fraudulent importations by the same party as fraud would be in the last importation from prior fraudulent importations. In each case the quo animo is in question, and the presumption may equally arise and equally prevail."

For the error in excluding evidence of false statements concerning other insurance in the subsequent policies, the judgment herein must be reversed. The case will doubtless be tried again, however; and it becomes our duty, therefore, to examine and decide other questions made upon this record by the defendant which must, of necessity, arise again on the second trial.

At the trial the defendant introduced witnesses who had been long engaged in the life insurance business, and was permitted by the court to ask them whether the facts concerning which it was either admitted or claimed that Schardt had made untrue statements, and the fact of his embezzlements which he did not disclose, were material to the risk; but the court declined to permit an answer to the question whether, by the usage and practice of all insurance companies, such facts were regarded as material. This latter ruling of the court was excepted to by the defendant company. The question of evidence thus presented has been before the courts of England and America in many different phases, and the decisions present a bewildering conflict of authority. In the

leading case of Carter v. Boehm, 3 Burrows, 1905, the question arose what effect, if any, was to be given to the opinion of a broker that certain statements in a letter within the knowledge of the insured should have been communicated to the insurer, and that if they had been the insurer would not have "meddled" with the insurance. The subject of insurance was a so-called fort and warehouse in the island of Sumatra, and the danger insured against was capture by the enemy. The facts stated in the letter, not communicated, were a report of an abandoned plan of the French in the previous year to attack the place, and the surmise of the writer that a similar plan might be carried out during the then current year. Lord Mansfield said of the evidence:

"But we all think the jury ought not to pay the least regard to it. It is mere opinion, which is not evidence. It is opinion after the event. It is opinion without the least foundation from any previous precedent or usage. It is an opinion which, if rightly formed, could only be drawn from the same premises from which the court and jury were to determine the cause, and therefore it is improper and irrelevant in the mouth of a witness."

Prior to this, in 1740, Chief Justice Lee, of the common pleas, had admitted as evidence the opinion of insurance brokers that contents of a letter concerning a ship should have been disclosed. Seaman v. Fonereau, 2 Strange, 1183. Lord Kenyon (Lord Mansfield's successor) held that commercial men might testify that, had a fact been known concerning the voyage of a ship, it would have made a difference of 15 per cent. in the premium, and that many underwriters would not have taken the risk on any terms, and expressed the opinion that such evidence was good evidence, admissible upon the same ground that the evidence of persons versed in arts and science was admitted on questions involving them. Chaurand v. Angerstein, Peake, 45. In Haywood v. Rogers, 4 East, 590, before Lord Ellenborough, evidence of insurance brokers as to the effect of certain facts upon insurance premiums was admitted without objection, but it was not given any weight by the court. In Littledale v. Dixon, 1 Bos. & P. (N. R.) 152, the common pleas court considered evidence (admitted, so far as appears, without objection) that the knowledge of the safe arrival of two ships which had left the same port after the one insured would not vary the premium actually demanded. In Berthon v. Loughman, 2 Starkie, 258, Mr. Justice Holroyd, of the queen's bench, held that, upon the question of the materiality of a fact, it was competent to ask an insurance broker what effect its disclosure would have among underwriters generally to increase the premium, but not what the witness would do in a particular case. In the preceding year, Chief Justice Gibbs held that a rumor, if material, ought to be communicated, but held that the opinion of underwriters as to whether the rumor, or any other fact, was material, was inadmissible, stating that Lord Mansfield and Lord Kenyon had discountenanced this kind of evidence. Durrell v. Bederley, Holt, N. P. 286. With respect to Lord Kenyon, as we have seen, he was hardly accurate. In Rickards v. Murdock, 10 Barn. & C. 527, Lord Tenterden, of the queen's bench, was in accord with his colleague, Mr. Justice Holroyd, and held that underwriters

might testify that a fact not disclosed was material; and his ruling was not disturbed by the full court. In Elton v. Larkins, 5 Car. & P. 392, before Tindal, C. J., evidence of underwriters was admitted to the point that time of the vessel's sailing was material, and that, had it been known, the policy would not have been issued. In this case, Wilde, sergeant, stated that such evidence, in spite of Lord Mansfield's objection, seemed to have crept into competency. In Chapman v. Walton, 10 Bing. 57, a case heard by the court of common pleas in banc, the question was somewhat different. It was on an issue whether an underwriter had been derelict in altering insurance under instructions. The evidence of underwriters was held competent upon the point of what a reasonably skillful and prudent underwriter would have done. In admitting the evidence, however, Chief Justice Tindal, of the common pleas, relied on Justice Holroyd's decision in Berthon v. Loughman, and expressly dissented from the view of his predecessor, Chief Justice Gibbs, in Durrell v. Bederley. In Quin v. Assurance Co., Jones & C. 316, the Irish exchequer chamber followed Rickards v. Murdock and Berthon v. Loughman, and admitted evidence of the secretary of the insurance company that knowledge by his company of an undisclosed fact would have raised the rate of insurance premium it would have demanded. In Campbell v. Rickards, 5 Barn. & Adol. 840, precisely the same question came before the court of queen's bench in banc which had been before that court in Rickards v. Murdock. The decision in the latter case was overruled, and it was held that the evidence of underwriters upon the materiality of the undisclosed fact was not competent. The case is put on the authority of Lord Mansfield and Chief Justice Gibbs, and the then recent decision of the common pleas in Chapman v. Walton is not referred to. This is the last English case where the question has been raised and discussed. In Ionides v. Pender, L. R. 9 Q. B. 531, evidence of underwriters that overvaluation of the cargo was a material fact to be known, that in such a case the risk was considered speculative, that some underwriters would not take such risks, and others would take it only at an advance in the premium of from 25 to 30 per cent., was admitted without objection, and seems to have formed one of the chief grounds for the judgment of the court, delivered by Mr. Justice Blackburn. It may fairly be said, from this review of the English cases, that the question is an open one. See 1 Smith, Lead. Cas. Eq. 572. Even in those cases where evidence of underwriters has been admitted, no distinction has been recognized, except, possibly, by Mr. Justice Holroyd in Berthon v. Loughman, 2 Starkie, 258, between the individual opinions of such witnesses as to the materiality of undisclosed or misrepresented facts, and their statements, based on usage, of the effect which a knowledge of such facts would have among underwriters generally, upon insurance premiums.

In this country, though all the cases are not easily reconciled, it is not so difficult as in England to reach a satisfactory result. At first, in marine cases, it was generally held that underwriters

might be asked the direct question whether the facts undisclosed were material to the risk. Mr. Justice Washington permitted it in two cases. Moses v. Insurance Co., 1 Wash. C. C. 386, Fed. Cas. No. 9,872; Marshall v. Insurance Co., 2 Wash. C. C. 357, Fed. Cas. No. 9,133. In McLanahan v. Insurance Co., 1 Pet. 170, the question was whether the time of sailing was material to the risk, as a matter of law; and, in pointing out why it was a question for the jury, Mr. Justice Story said:

"The material ingredients of all such inquiries are mixed up with nautical skill, information, and experience, and are to be ascertained, in part, upon the testimony of maritime persons, and are in no sense judicially cognizable at law. The ultimate fact itself, which is the test of materiality,—that is whether the risk be increased so as to enhance the premium,—is in many cases an inquiry dependent upon the judgment of underwriters and others who are conversant with the subject of insurance."

In Hawes v. Insurance Co., Fed. Cas. No. 6,241, the issue was whether the failure to disclose that a vessel was aground was a material fact, and an underwriter was called to give evidence. Mr. Justice Curtis said:

"I do not allow you to ask the witness what he himself, as an underwriter, would have done, but whether, from his knowledge of the business, he is able to state that the facts in question would or would not have an influence with underwriters generally, in determining the amount of the premium. * * * Here the inquiry is, in substance, whether the market price of insurance is affected by particular facts. If the witness, being conversant with the business, has gained, in the course of his employment, a knowledge of the practical effect of these facts, or similar facts, upon premiums, he may inform the jury what it is."

The question soon arose in fire insurance cases. In Merriam v. Insurance Co., 21 Pick. 162, where the issue was whether a condition of the policy that no alteration while the policy was current should be made in the building insured, which would increase the risk of fire, was violated, the court held that the alteration must have been such that a higher rate of premium would have been demanded for insurance of the building in its altered form than before. With this as a test of materiality, which, as we have seen, was approved by Mr. Justice Story in McLanahan v. Insurance Co., supra, the same court, in subsequent cases, has established a distinction, to be enforced in the use of insurance expert evidence on such an issue, which was hinted at by Mr. Justice Holroyd in Berthon v. Loughman, 2 Starkie, 258, and by Mr. Justice Curtis in Hawes v. Insurance Co., Fed. Cas. No. 6,241. It is clearly stated by Mr. Justice Gray in Luce v. Insurance Co., 105 Mass. 297. There the issue was whether risk of fire was increased by leaving a house unoccupied. Following decisions of the same court in Mulry v. Insurance Co., 5 Gray, 541, and Lyman v. Insurance Co., 14 Allen, 329, the court held that insurance experts could not testify that it did increase the risk, because it was only a matter of common knowledge. The learned justice continued, however, as follows:

"But whether such a change in the occupation is material to the risk might also be tested by the question whether underwriters generally would charge a higher premium. Merriam v. Insurance Co., 21 Pick. 162. That being a

matter within the peculiar knowledge of persons versed in the business of insurance, testimony of such persons upon that point is admissible."

Cited in support of this are the remarks of Justice Story and of Justice Curtis above quoted.   The distinction stated in Luce v. Insurance Co. has been approved by the same court in the late case of First Congregational Church of Rockland v. Holyoke Mut. Fire Ins. Co., 158 Mass. 475, 33 N. E. 572, and has been recognized by courts of other states.   Insurance Co. v. Rowland, 66 Md. 236, 244, 7 Atl. 257; Insurance Co. v. Gruver, 100 Pa. St. 266.   Such a distinction would also seem to be the basis of the ruling in Martin v. Insurance Co., 42 N. J. Law, 46.   In the later New York fire insurance cases, though they are hardly to be reconciled with Insurance Co. v. Cotheal, 7 Wend. 72, it seems to be ruled that insurance experts may be asked directly whether the fact in question would increase the risk.   Hobby v. Dana, 17 Barb. 111; Cornish v. Insurance Co., 74 N. Y. 297; Leitch v. Insurance Co., 66 N. Y. 102.   Reliance is had by the New York courts upon the opinion of Chancellor Kent, expressed in his Commentaries (volume 3, p. 285), that such evidence is admissible.   The same ruling is made in Kern v. Insurance Co., 40 Mo. 19, and in Mitchell v. Insurance Co., 32 Iowa, 424, and Russell v. Insurance Co., 78 Iowa, 216, 42 N. W. 654.   In Schenck v. Insurance Co., 24 N. J. Law, 451, it was held proper to ask a fireman of 10 years' experience whether a second story to an L increased the risk.   In Brink v. Insurance Co., 49 Vt. 442, it was held that the owner of a sawmill, who had altered it, might testify that in his opinion the alteration did not increase the risk of fire.   And in Daniels v. Insurance Co., 12 Cush. 416, an insurance expert was allowed to state that the erection of a partition did not increase the risk; but this is not to be harmonized with the later Massachusetts cases.   The great weight of authority in this country, however, is against the view that an insurance expert may be asked his own opinion whether the undisclosed or misrepresented facts were material to the risk.   In addition to the Massachusetts cases above cited, there is a most satisfactory discussion of the subject in Insurance Co. v. Harmer, 2 Ohio St. 455, and in Hill v. Insurance Co., 2 Mich. 481.   Other cases to the same effect are Schmidt v. Insurance Co., 41 Ill. 295; Joyce v. Insurance Co., 45 Me. 169; Cannell v. Insurance Co., 59 Me. 582; Thayer v. Insurance Co., 70 Me. 539; Kirby v. Insurance Co., 9 Lea, 142.   In State v. Watson, 65 Me. 74, the issue was, in a prosecution for arson, whether it could be expected that fire from one building would be communicated to another building, some distance away from the first.   It was held improper to admit evidence of insurance experts on this question.   And a similar ruling was made by the supreme court of the United States in Railroad Co. v. Kellogg, 94 U. S. 472,—an action for damages for burning a warehouse by locomotive sparks.   The issue was whether the communication of fire from a pile of lumber to the warehouse and other buildings might have been reasonably anticipated, and insurance experts were called.   Their evidence was held inadmissible; and Mr. Justice Strong, in delivering the opinion of the court, cites the language of Lord Mansfield in Carter v. Boehm, of Chief Justice Gibbs in Durrell

v. Bederly, and of Lord Denman in Campbell v. Rickards, in support of this conclusion. It is in accord with the better reason, also, to exclude opinions of insurance experts upon the point whether an undisclosed fact was material to an insurance risk. If it requires scientific knowledge or peculiar skill to trace the possible causal or evidential connection between the fact claimed to be material and the loss or death insured against, then, of course, the testimony of those learned in the necessary science, or trained in the particular craft, should be furnished to the jury, to enable them properly to estimate the weight which a reasonably prudent insurer would naturally give to the fact, in his calculation of chances. But where the calculation of the chances involves a consideration only of facts of everyday life, of the motives of men living in the same community with members of the jury, and of those ordinary physical and natural causes of which every man is presumed to have an understanding, it is difficult to see why an insurance examiner should be permitted to influence the jury by giving his sworn opinion on the very issue which they are assembled to try, and of which they are presumed to have the same opportunities upon which to found a reliable judgment as he. It is true, he may have had occasion, in his business, to consider and weigh facts of this character, for this purpose, much more frequently than the jury, but that does not render his opinions on the facts competent evidence. It is the business of judges and lawyers to consider and estimate the value of evidence, and for their own use they doubtless formulate in their minds certain rules for weighing and sifting facts and motives, and by such practice may have acquired great skill in divining the truth; but no one would say that their judgment of the facts of a case could be given in evidence before a jury to assist the jury in its deliberations.

The better authorities, however, seem to sustain the rule that the insurance experts may testify concerning the usage of insurance companies generally in charging higher rates of premium or in rejecting risks, when made aware of the fact claimed to be material. The distinction between this and the rule just discussed may seem at first a close one, but on consideration it appears to be sound. It may be asked why, if one insurance man of long experience cannot give his individual opinion that a fact is or is not material to a risk, should it be competent for him to state the opinions of a great many insurance men on the same question? A fact is material to an insurance risk when it naturally and substantially increases the probability of that event upon which the policy is to become payable. Materiality of a fact, in insurance law, is subjective. It concerns rather the impression which the fact claimed to be material would reasonably and naturally convey to the insurer's mind before the event, and at the time the insurance is effected, than the subsequent actual causal connection between the fact, or the probable cause it evidences, and the event. Thus, it is by no means conclusive upon the question of the materiality of a fact that it was actually one link in a chain of causes leading to the event. Watson v. Mainwaring, 4 Taunt. 763; Jones v. Insurance Co., 3 C. B. (N. S.) 65; Rose v. Insurance Co., 2 Ir. Jur.

206; Insurance Co. v. Schultz, 73 Ill. 586. And, on the other hand, it does not disprove that a fact may have been material to the risk because it had no actual subsequent relation to the manner in which the event insured against did occur. A fair test of the materiality of a fact is found, therefore, in the answer to the question whether reasonably careful and intelligent men would have regarded the fact, communicated at the time of effecting the insurance, as substantially increasing the chances of the loss insured against. The best evidence of this is to be found in the usage and practice of insurance companies in regard to raising the rates or in rejecting the risk on becoming aware of the fact. If the rates are not raised in such a case, it may be inferred that reasonably careful men do not regard the fact as material. If the rates are raised, or the risk is rejected, then they do.

The question still remains whether the rules above stated are applicable to life insurance cases. Certainly, there is the same ground for excluding the individual opinions of insurance men upon the materiality of particular facts as in marine and fire insurance. Of course, the evidence of physicians as to the tendency of diseases and bodily conditions or habits to shorten life is competent, but insurance men are not experts upon these subjects. Facts other than those relating to the health and habits of the applicant usually either relate to the motive of the applicant to destroy himself, or increase the probability of death by exposure to bodily injury. Of the materiality of this class of facts the jury can judge quite as well as one experienced in passing on insurance risks. They are within the common knowledge of mankind. The evidence of the insurance experts that certain facts were material to the risk was therefore incompetent.

The question of the competency of the evidence of insurance experts as to the usage of life insurance companies generally to raise premiums or reject risks when made aware of an undisclosed or misrepresented fact is more uncertain. In Rawls v. Insurance Co., 27 N. Y. 287, 290, the defendants made a general offer to prove by experts in the business of life insurance that a person who was in the habitual use, to excess, of intoxicating drinks, would not be considered an insurable subject. The court said:

"This was rightly excluded. It was entirely immaterial what description of subject persons or companies engaged in the business of life insurance would consider good or bad risks. The inquiry did not relate to matters of science or skill, but called, in effect, for the opinion of witnesses as to what persons engaged in a particular business would consider prudent to do in certain cases."

The case was followed in Higbie v. Insurance Co., 53 N. Y. 603, and the same ruling was made in a life insurance case in West Virginia. Schwarzbach v. Protective Union, 25 W. Va. 622, 652.

It is very hard to reconcile the decision in Rawls v. Insurance Co. with the subsequent fire insurance cases, already referred to, of Cornish v. Insurance Co., 74 N. Y. 297, and Leitch v. Insurance Co., 66 N. Y. 102. It will not do to distinguish them on the ground that the one relates to life insurance, and the others to fire insurance, because the case upon which the court relies in Rawls'

case is Joyce v. Insurance Co., 45 Me. 168,—a fire insurance case.
After a full consideration, we can see no reason why, in this re-
gard, the rule in life insurance cases should be different from that in
fire insurance cases. Our conclusion is in accordance with a decision
of the supreme court of Pennsylvania, delivered by Chief Justice
Black, in Hartman v. Insurance Co., 21 Pa. St. 466. In that case an
applicant had stated that he was a farmer, when in fact he was
a railroad man and a slave catcher. One familiar with the insur-
ance business, it was held, might testify that in his own and all
other companies a high rate of premium was charged for a rail-
road man, and that no insurance would be issued upon the life of a
slave catcher, whose occupation was considered extra hazardous.
The case is cited in First Congregational Church of Rockland v.
Holyoke Mut. Fire Ins. Co., 158 Mass. 475, 33 N. E. 572, as support-
ing the distinction formulated by Justice Gray in Luce v. Insurance
Co., 105 Mass. 297, and we think it may be so treated. Of course,
such evidence as this is only to aid the jury, and will not be con-
clusive upon them; but, according to the best-considered authori-
ties, it is admissible. If the fact, the materiality of which is in
question, is one of a class of facts which life insurance companies
are frequently required to consider in relation to the acceptance
of risks, so that a witness may base an answer on a well-defined
practice of insurance companies, we think such an answer com-
petent. But care must be taken that the witness shall not sub-
stitute his own opinion, or that of his own company only, neither
of which is relevant, for the usage of companies generally. The
modern practice of life insurance companies seems to be, not to
vary the premium, except for age, and either to accept risks of
the same age, or reject them altogether. If so, there would seem
to be no means of judging the materiality of any other fact than
that of age, from the usage or practice of insurance companies,
except by their acceptance or rejection of the risk; and the ques-
tion should be limited, in such cases, therefore, to whether in-
surance companies generally, if made aware of the undisclosed fact,
would reject the risk. The question which the court refused to
permit was whether the misrepresented or concealed fact would be
regarded among insurance companies generally as material. This
was rightly rejected. The proper form in which the question might
have been put to a duly-qualified witness was:

"Are you able to say, from your knowledge of the practice and usage among
life insurance companies generally, that information of this fact would have
enhanced the premium to be charged, or would have led to a rejection of the
risk?"

It was clearly right in the trial court to refuse to direct the jury
to return a verdict for the defendant on the ground that the $5,000
policy in the New York Life Insurance Company on Schardt's
life was a fact material to the risk, as matter of law. Where the
parties have not, by the terms of the application and policy, im-
pliedly stipulated that each subject inquired about shall be ma-
terial, the question whether a fact is material to the risk is always

a question for the jury. Now, but for the statute of Pennsylvania already considered, the provisions of the policy here in suit would certainly render the answer to each question of the application material, with all the consequences thus imposed by the law of insurance; but, as already stated, it was the chief purpose of the statute to destroy such conventional materiality, and to open to judicial investigation the question on its merits. Much reliance is had by counsel for plaintiff in error on the language of Mr. Justice Gray in Insurance Co. v. Raddin, 120 U. S. 183, 189, 7 Sup. Ct. 500, where, in delivering the opinion of the court, he said:

"Whether there is other insurance on the same subject, and whether such insurance has been applied for and refused, are material facts, at least, when statements regarding them are required by the insurers as part of the basis of the contract."

In support of this are cited the following cases: Carpenter v. Insurance Co., 16 Pet. 495; Jeffries v. Insurance Co., 22 Wall. 47; Anderson v. Fitzgerald, 4 H. L. Cas. 484; Macdonald v. Insurance Co., L. R. 9 Q. B. 328; Edington v. Insurance Co., 77 N. Y. 564; Id., 100 N. Y. 536, 3 N. E. 315. In each one of these cases it will be found that by the terms of the policy the application and its answers were made the basis of the contract, and the question and answer concerning other insurance gave that fact a contractual materiality. The same thing is true of the other cases cited by counsel for the plaintiff in error: Insurance Co. v. Winslow, 3 Gray, 431; Ryan v. Insurance Co., 46 Wis. 674, 1 N. W. 426; Byers v. Insurance Co., 35 Ohio St. 614; Cooper v. Insurance Co., 50 Pa. St. 299; Insurance Co. v. Small, 14 C. C. A. 33, 66 Fed. 494; Bard v. Insurance Co, 153 Pa. St. 261, 25 Atl. 1124; Mitchell v. Insurance Co., 51 Pa. St. 402; Obermeyer v. Insurance Co., 43 Mo. 576; Hutchison v. Insurance Co., 21 Mo. 101. In London Assurance v. Mansel, 11 Ch. Div. 370, cited for plaintiff in error, the action was in equity to set aside a policy; and, of course, it became a question for the court to decide whether that which had been concealed was material. But the court in that case intimated that it would have been a question of fact for the jury, in an action at law, had the parties not foreclosed the inquiry by an implied stipulation that it should be material. In Insurance Co. v. Lawrence, 2 Pet. 49, the concealed or misrepresented fact related to the interest of the assured in the subject of insurance, and Chief Justice Marshall points out with much clearness and force why it might, and would naturally, be quite material to the risk; but an examination of Mr. Justice Story's opinion in the same case when it was again before the court shows that the remarks of the chief justice were not intended to settle the materiality, as matter of law, for on the second hearing the court expressly decided that the question was one of fact for the jury. See Insurance Co. v. Lawrence, 10 Pet. 516, 517. The circuit court of appeals of the Third circuit has had occasion quite recently to consider when the materiality of a fact is for the jury, and, in a clearly-stated opinion, Judge Wales shows that it is always for the jury, unless the answers in the application are expressly made the basis of the contract. Casualty Co. v. Alpert, 14 C. C. A. 474, 67 Fed.

460.    In Insurance Co. v. Ruden's Adm'r, 6 Cranch, 339, Chief Justice Marshall said:

"It is well settled that the operation of any concealment on the policy depends on its materiality to the risk, and this court has decided that this materiality is a question for the jury."

Other cases to the same effect are Garcelon v. Insurance Co., 50 Me. 580; Insurance Co. v. Deale, 18 Md. 26; Keeler v. Insurance Co., 16 Wis. 523; Loan Co. v. Snyder, 16 Wend. 481; Daniels v. Insurance Co., 12 Cush. 416; Insurance Co. v. Coates, 14 Md. 285; Insurance Co v. Chase, 5 Wall. 509. The remark in the opinion of this court in Society v. Llewellyn, 16 U. S. App. 405, 7 C. C. A. 579, 58 Fed. 940, from which it might be inferred that the question of the materiality of the insured's having delirium tremens is a matter of law for the court, in any case where inquiry is not foreclosed by express or implied stipulation, was unnecessary to the decision of that case, and cannot be supported.

The same reasons which made the materiality of the additional insurance a question for the jury required the court to submit the materiality of the embezzlements to that tribunal, and the exception based on the court's refusal to hold that they were material, as matter of law, cannot be sustained.

The court was clearly right in refusing to direct a verdict for the defendant on the ground that the uncontradicted evidence showed that Schardt had had syphilis, when he had denied it in his answers. The evidence left it a controverted issue of fact whether Schardt had suffered from this disease, and the questions of his having had it, and of its materiality, were both for the jury. Equally unobjectionable was the refusal to direct a verdict on the ground that it was admitted that Schardt had other diseases. The court left it to the jury to determine whether the sore throat and other ailments from which Schardt had suffered were really diseases, within the policy, and also to say whether they were material to the risk. It is well settled that mere temporary ailments or affections, not of a serious or dangerous character, which pass away, and are likely to be forgotten, because they leave no trace in the constitution, are not to be regarded as diseases, within the meaning of a life insurance policy. Connecticut Mut. Life Ins. Co. v. Union Trust Co., 112 U. S. 250, 5 Sup. Ct. 119; Insurance Co. v. Moore, 6 App. Cas. 648; Indemnity Co. v. Dorgan, 16 U. S. App. 290, 7 C. C. A. 581, 58 Fed. 945, and cases there cited; Insurance Co. v. Wise, 34 Md. 582; Wilkinson v. Insurance Co., 30 Iowa, 119; Fitch v. Insurance Co., 59 N. Y. 557; Cushman v. Insurance Co., 70 N. Y. 72, 77; Goucher v. Association, 20 Fed. 596; Society v. Winthrop, 85 Ill. 537; Insurance Co. v. McTague, 49 N. J. Law, 587, 9 Atl. 766; Brown v. Insurance Co., 65 Mich. 306, 314, 32 N. W. 610; Hann v. National Union, 97 Mich. 513, 56 N. W. 834. The ailments which it was conceded Schardt had were of a character which made it entirely proper to submit to the jury the question whether they could be said to rise to the dignity of diseases, within the meaning of the policy. Morrison v. Muspratt, 4 Bing. 60; Fitch v. Insurance Co., 59 N. Y. 557.

The trial court held, against the objection of defendant, that, when Schardt was asked what his occupation was, he answered truly that he was a bank teller, and that the scope of the question was not such as to require him to add that he was an habitual embezzler. We concur in this view. Neither the company nor Schardt could have thus understood the question. The embezzling was merely misfeasance in his position as teller. He was an unfaithful bank teller. But nothing in the question called upon him to say whether he was a good or bad bank teller. In New York Bowery Fire Ins. Co. v. New York Fire Ins. Co., 17 Wend. 359, the issue was whether a contract of reinsurance was avoided by the failure of the company seeking reinsurance to communicate to the reinsurer facts known to it reflecting on the character of the original insured. The supreme court of New York held that it was, but in doing so expressed, through Justice Bronson, its opinion of what the duty of the original insured was in this regard:

"The general doctrine [i. e. of concealment] on this subject is not denied, but it is said that the character of Mortimer [i. e. the original insured] was not a fact material to the risk; that the person applying for insurance is not bound to say anything about his own character. The last branch of the remark is undoubtedly true. Had Mortimer applied to defendants for insurance, he was not bound, nor could it be expected, that he should speak evil of himself. Good manners on the part of the underwriter, and self-respect on the part of the applicant, would forbid a conversation on the subject of character. If the underwriter wished information on that point, he would naturally seek it from some other source." 17 Wend. 366, 367.

This passage is referred to with approval by the supreme court of the United States in the case of Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U. S. 485, 510, 1 Sup. Ct. 582. Justice Bronson's discussion related to the disclosure of a fact not inquired about, and the rule there laid down was, of course, not intended to relieve an applicant from answering questions put to him, which, in their necessary scope, require statements from him which relate to his moral character. Nevertheless the reasoning of the court justifies the conclusion that the insured is not called upon to construe a simple question concerning his ordinary vocation into one calling for a statement of crimes or misfeasances of which he may have been guilty in pursuing such vocation. Then it is said that he had expressly warranted that, in his statements and answers in this application, no circumstances or information had been withheld touching his past and present state of health and habits of life, with which the Penn Mutual Life Insurance Company ought to be made acquainted, and that his habit of embezzling should have been communicated, to comply with that warranty. We are of opinion that these words refer to questions and answers in the application, and are equivalent to a warranty that the answers to the questions are full and complete. The habits of life referred to are those inquired about in the medical examination, and are those which have a direct relation to physical health, and could not be construed to refer to thefts or embezzlements of which the applicant may have been guilty, and concerning which no inquiry was made.

But, even if Schardt was not required by any specific question to disclose the fact of his embezzlements, the policy would still be avoided,

if it were material to the risk, and he intentionally concealed it from the company. This is not controverted. The issue of law between the parties is whether the policy would not be avoided, even if his failure to disclose it were due, not to fraudulent intent, but to mere inadvertence, or a belief that it was not material. It is insisted for the plaintiff in error that the motive or cause of the nondisclosure is unimportant, if the fact be found material to the risk, and was known to the insured when he obtained the insurance. The trial court took the other view, and instructed the jury accordingly. If this were a case of marine insurance, the contention for the plaintiff in error must certainly be sustained. The great and leading case on the subject is that of Carter v. Boehm, 3 Burrows, 1905, where Lord Mansfield explained the effect of concealment of material facts in insurance to avoid the policy. He said:

"Insurance is a contract upon speculation. The special facts upon which the contingent chance is to be computed lie most commonly in the knowledge of the insured only. The underwriter trusts to his representations, and proceeds upon confidence that he does not keep back any circumstance in his knowledge to mislead the underwriter into a belief that the circumstance does not exist, and to induce him to estimate the risk as if it did not exist. The keeping back such a circumstance is a fraud, and therefore the policy is void. Although the suppression should happen through mistake, without any fraudulent intention, yet still the underwriter is deceived, and the policy is void, because the risk run is really different from the risk understood and intended to be run at the time of the agreement."

Carter v. Boehm was the case of insurance of a fort and warehouse in the East Indies against capture by the enemy; and, although not strictly a case of marine insurance, it has usually been treated as such, because of the resemblance of the risk, in its speculative character, to that of a merchant vessel in time of war. That it states the rule enforced by the courts of this country in cases of marine insurance is established by many decisions. Perhaps the one most recently considered by the supreme court of the United States was a case of reinsurance of a marine risk. Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U. S. 485, 1 Sup. Ct. 582. The very marked difference between the situation of the parties in marine insurance and that of parties to a fire or life policy has led many courts of this country to modify the rigor of the doctrine in its application to fire and life insurance, and to lean towards the view that no failure to disclose a fact material to the risk, not inquired about, will avoid the policy, unless such nondisclosure was with intent to conceal from the insurer a fact believed to be material; that is, unless the nondisclosure was fraudulent. In marine insurance the risk was usually tendered and accepted when the vessel was on the high seas, where the insurer had no opportunity to examine her, or to know the particular circumstances of danger to which she might be exposed. The risk in such a case is highly speculative, and it is manifestly the duty of the insured to advise the insurer of every circumstance within his knowledge from which the probability of a loss can be inferred, and he cannot be permitted to escape the obligation by a plea of inadvertence or negligence. In cases of fire and life insurance, however, the parties stand much more nearly on an equality. The subject of the fire insurance is usually

where the insurer can send its agents to give it a thorough examination, and determine the extent to which it is exposed to danger of fire from surrounding buildings, or because of the plan or material of its own structure.    The subject of life insurance is always present for physical examination by medical experts of the insurer, who often acquire, by lung and heart tests, and by chemical analysis of bodily excretions, a more intimate knowledge of the bodily condition of the applicant than he has himself.    Then, too, the practice has grown of requiring the applicant for both fire and life insurance to answer a great many questions carefully adapted to elicit facts which the insurer deems of importance in estimating the risk.    In life insurance, not only is the applicant required to answer many general questions concerning himself and his ancestors, but he is also subjected to an extended examination concerning his bodily history.    This was true in the case at bar.    When the applicant has fully and truthfully answered all these questions, he may rightfully assume that the range of the examination has covered all matters within ordinary human experience deemed material by the insurer, and that he is not required to rack his memory for circumstances of possible materiality, not inquired about, and to volunteer them.    He can only be said to fail in his duty to the insurer when he withholds from him some fact which, though not made the subject of inquiry, he nevertheless believes to be material to the risk, and actually is so, for fear it would induce a rejection of the risk, or, what is the same thing, with fraudulent intent.    A strong reason why the rule as to concealment should not be so stringent in cases of life insurance as in marine insurance is that the question of concealment rarely, if ever, arises until after the death of the applicant, and then the mouth of him whose silence and whose knowledge it is claimed avoid the policy is closed.    The application is generally prepared, and the questions are generally answered, under the supervision of an eager life insurance solicitor. Only the barest outlines of the conversations between the applicant and the solicitor are reduced to writing.    The applicant is likely to trust the judgment of the solicitor as to the materiality of everything not made the subject of express inquiry, and, with the solicitor's strong motive for securing the business, there is danger that facts communicated to him may not find their way into the application. With respect to a contract thus made, it is clearly just to require that nothing but a fraudulent nondisclosure shall avoid the policy. Nor does this rule result in practical hardship to the insurer, for in every case where the undisclosed fact is palpably material to the risk the mere nondisclosure is itself strong evidence of a fraudulent intent. Thus, if a man, about to fight a duel, should obtain life insurance without disclosing his intention, it would seem that no argument or additional evidence would be needed to show the fraudulent character of the nondisclosure.    On the other hand, where men may reasonably differ as to the materiality of a fact concerning which the insurer might have elicited full information, and did not do so, the insurer occupies no such position of disadvantage in judging of the risk as to make it unjust to require that before the policy is avoided it shall ap-

pear, not only that the undisclosed fact was material, but also that it was withheld in bad faith.    To hold that good faith is immaterial in such a case is to apply the harsh and rigorous rule of marine insurance to a class of insurance contracts differing so materially from marine policies in the circumstances under which the contracting parties agree that the reason for the rule ceases.    The authorities are not uniform, and we are able to take that view which is more clearly founded in reason and justice.    In England, the tendency of the courts has been to hold that the same rules apply to fire and life insurance as to marine insurance, in reference to the effect of the concealment of material facts.    In Bufe v. Turner, 6 Taunt. 338, it was held that the failure to disclose a fact which the jury found material to a fire risk avoided the policy, although the nondisclosure was in entire good faith.    In Huguenin v. Rayley, Id. 186, and in Morrison v. Muspratt, 4 Bing. 60, the same ruling was made in cases of life insurance.    In Lindenau v. Desborough, 8 Barn. & C. 586, which was also a case of life insurance and concealment, Bayley, J., stated his view thus:

"I think that in all cases of insurance, whether on ships, houses, or lives, the underwriter should be informed of every material circumstance within the knowledge of the assured, and that the proper question is whether any particular circumstance was in fact material, and not whether the party believed it to be so."

The other judges expressed similar opinions.    This language is quoted with approval by Sir George Jessel, M. R., in London Assurance v. Mansel, 11 Ch. Div. 363.    In Abbott v. Howard, Hayes, 381, the Irish exchequer chamber expressed approval of Lindenau v. Desborough, and followed it in a fire insurance case.    In Insurance Co. v. Lloyd, 10 Exch. 523, the court of exchequer held, in a case of guaranty, that the rule as to concealments in life and marine insurance was the same.    Chief Baron Pollock said:

"It seems to us an incorrect proposition that the same rule prevails in the case of guaranties as in assurances upon ships or lives, in which it is a settled rule that all material circumstances known to the assured are to be disclosed, though there be no fraud in the concealment.    This is peculiar to the nature of such contracts, in which, in general, the assured knows, and the underwriter does not know, the circumstances of the voyage, or the state of the health."

This case is cited by Mr. Justice Swayne in delivering the opinion of the court in Magee v. Insurance Co., 92 U. S. 93, on a question of guaranty; but such citation can hardly be regarded as a considered approval of the declaration by the court of exchequer that the rule as to concealments was the same in life as in marine insurance.    In the course of the argument in Lloyd's Case, Baron Parke approves the statement of some able American law writer on insurance,—presumably Mr. Duer,—that the rule for the necessity of the disclosure of all material circumstances in cases of insurance is founded on mercantile usage, and not upon fraud.    10 Exch. 531.    This only confirms our view that the rule had its origin in the peculiar exigencies of a very speculative business, to wit, marine insurance.    To enforce it in respect to life insurance is to transfer the result of a usage

prevailing in one branch of business to another, where the conditions are very different, and are of a character that prevents the possibility of the existence of a definite usage, well known to both parties, in respect to the contracts made. It is the business of shipowners and their brokers frequently to deal in insurance, and they may be presumed to know the usages prevailing with respect to contracts that they are constantly making. In life insurance the insured never makes a business of taking such insurances, and in most cases he takes but one policy. In Wheelton v. Hardisty, 8 El. & Bl. 232, 283, the exchequer chamber held that an untrue statement of a material fact in a proposal for insurance, made, not by the insured, but by the person whose life was the subject of insurance, did not avoid the policy, in the absence of knowledge of its untruth by the insured. In this conclusion the court avowedly departed from the rule of law governing marine policies, by which such a statement is always treated as a warranty and condition of the policy. See, especially, the judgments of Martin and Bramwell, BB., and Crowder, J., pages 298, 300, 397. In Thomson v. Weems, 9 App. Cas. 671, which was a Scotch appeal in a life insurance case, Lord Blackburn said:

"In policies of marine insurance, I think it is settled by authority that any statement of a fact bearing upon the risk introduced into the written policy, is, by whatever words and in whatsoever place, to be construed as a warranty, and prima facie, at least, that the compliance with that warranty is a condition precedent to the attaching of the risk. I think that, on the balance of authority, the general principles of insurance law apply to all insurances, whether marine, life, or fire. See per Lord Eldon, C., in a Scotch appeal in a fire insurance case. Insurance Co. v. Macmorran (July 10, 1815) 3 Dow, at page 262. No question arises on that in the present case, but I do not think that this rule as to the construction of marine policies is also applicable to the construction of life policies."

Mr. Pollock states, in the fourth edition of his work on Contracts (page 490, note i), that Wheelton v. Hardisty virtually overrules Lindenau v. Desborough. It may be doubted whether it has this effect, because the latter case only established the doctrine that the withholding of any material fact "within the knowledge of the assured" avoided the policy, whereas in Wheelton v. Hardisty the untrue statement was not made by the assured, and its untruth was not known to him. But, while Mr. Pollock's view of the conflict between Lindenau v. Desborough and Wheelton v. Hardisty may not be precisely accurate, it is certainly true that the latter case, decided by the highest court in England before which the question has come in such a way as to require decision, is an authority for the proposition that the peculiar circumstances under which marine policies are issued require a construction of their terms that is not given to policies of life and fire insurance. It is said that the utmost good faith (uberrima fides) is required in all contracts of insurance, and hence the same rule of concealment must apply to life and fire insurance, and must avoid a policy for nondisclosure of a material fact, though in entire good faith. But it was the same standard of uberrima fides which held the insurer to his innocent misrepresentations as conditions precedent and warranties in marine insurance. Why should not a difference be also made in respect to innocent nondisclosures in

life and fire insurance? The distinction made in Wheelton v. Hardisty between marine and life insurance policies seems to justify the language of Mr. Pollock, in his Contracts (4th Ed., p. 490), where, after stating the rule of concealments and misrepresentation in marine insurance, he says:

"These rules have, in modern times, at any rate, been uniformly treated, both at law and in equity, as determined by the exceptional and speculative nature of this particular contract, and not affording ground for any conclusions of general law. That they do not apply to the contract of life insurance is clear from the judgments in the exchequer chamber in Wheelton v. Hardisty, though a different opinion formerly prevailed, and in this very case was not contradicted in the court below."

Mr. Pollock refers to London Assurance v. Mansel, 11 Ch. Div. 363, as deciding that a material concealment avoids a policy of life insurance, but says:

"Probably a 'material fact' means, for this purpose, a fact such that its concealment makes the statement actually furnished, though literally true, so misleading, as it stands, as to be, in effect, untrue."

Certainly, this was all that it was necessary to decide in that case, although the words of Sir George Jessel are much broader. And, what is of prime importance to us, the supreme court of the United States has expressly approved the conclusion which the master of rolls reached in that case, on its facts, with an equally express dissent from the wider effect of his language. Insurance Co. v. Raddin, 120 U. S. 183, 7 Sup. Ct. 500, and the remarks of Mr. Justice Gray on page 192, 120 U. S., and page 500, 7 Sup. Ct.

Coming now to the American authorities, we find very early in reported cases a disposition to depart from the strict rules of marine insurance law in the consideration of fire and life policies. In Loan Co. v. Snyder, 16 Wend. 481, Chancellor Walworth, delivering the opinion of the supreme court of errors of New York, refers to the peculiar rule of construction applied to that "anomalous and informal instrument called a 'marine policy,'" and expresses the opinion that it is not to be applied in its strictness to fire policies. The same view is expressed in Jolly's Adm'rs v. Baltimore Equitable Soc., 1 Har. & G. 295, by the court of appeals of Maryland. In Burritt v. Insurance Co., 5 Hill, 188, Bronson, J., speaking for the supreme court of New York, after referring to the rule by which nondisclosure of material facts avoids a marine policy, although no inquiry be made, and although it is the result of innocent mistake or inadvertence, said (page 192):

"But this doctrine cannot be applicable—at least, not in its full extent—to policies against fire. If a man is content to insure my house without taking the trouble to inquire of what materials it is constructed, how it is situated in reference to other buildings, or to what uses it is applied, he has no ground for complaint that the hazard proves to be greater than he had anticipated, unless I am chargeable with some misrepresentation concerning the nature or extent of the risk. It is therefore the practice of companies which insure against fire to make inquiries of the assured, in some form, concerning all such matters as are deemed material to the risk, or which may affect the amount of premium to be paid. This is sometimes done by the conditions of insurance annexed to the policy, and sometimes by requiring the applicant to state particular facts in a written application for insurance. When thus called

upon to speak, he is bound to make a true and full representation concerning all the matters brought to his notice, and any concealment will have the like effect as in the case of a marine risk."

The use of "concealment," in this last passage, should be remarked. It means there a failure fully to answer a question put; and it was such a concealment which Sir George Jessel had to consider in London Assurance v. Mansel, and was defined by Sir Frederick Pollock. It is not a mere silence upon a matter not made the subject of inquiry. It is necessary to determine in which sense the word is used in decided cases, before their bearing on the present question can be clearly understood. Here we are considering only the duty of the insured in respect to something not inquired about. The supreme court of the United States, in Clark v. Insurance Co., 8 How. 235, 249, suggests a distinction between fire and marine insurance, in reference to the obligation of the insured to speak when not inquired of, and cites in support of it the Maryland and New York cases just referred to. In Gates v. Insurance Co., 5 N. Y. 469, the court of appeals held that in the case of a fire policy, where the insured makes a full answer to all the questions put to him, he is not answerable for an omission to mention the existence of other facts, about which no inquiry is made unless he withholds mention of them with intent to defraud. "He has a right to suppose that the insurer, in making inquiries in respect to particular facts, deems all others to be immaterial to the risk to be taken, or that he takes upon himself the knowledge or waives information of them." See, also, Browning v. Insurance Co., 71 N. Y. 508; Woodruff v. Insurance Co., 83 N. Y. 133; Short v. Insurance Co., 90 N. Y. 16; Haight v. Insurance Co., 92 N. Y. 55. In Insurance Co. v. Harmer, 2 Ohio St. 452, which was a fire insurance case, the defense was made that, previous to the issuing of the policy, there had been a fire in the insured premises, which had not been disclosed to the insurer. The court charged the jury that, if they found the circumstance to be material to the risk, the policy was void, "whether concealment resulted from fraud, accident, or mistake." Judge Ranney—one of Ohio's greatest judges—presided at the circuit in this cause, and delivered the opinion of the supreme court. In the supreme court he expressed the view that he was in error in his charge, in thus enforcing the rule of marine insurance in a fire insurance case. Such an expression of opinion was not necessary to the conclusion in the case, but the high standing of the judge gives great weight to even his obiter dictum. He said:

"It is not now true, whatever may be thought of the older authorities, that there is no difference in this respect [i. e. as to the rule of concealment] between marine and fire insurance, nor that a failure to disclose every fact material to the risk, upon which information is not asked for, or suppressed with a fraudulent intent, will avoid a policy of the latter description. The reason of the rule, and the policy in which it was founded, in its application to marine risks, entirely fail when applied to fire policies. In the former the subject of insurance is generally beyond the reach, and not open to the inspection, of the underwriter, often in distant ports or upon the high seas, and the peculiar perils to which it may be exposed, too numerous to be anticipated or inquired about, known only to the owners and those in their employ; while in the latter it is, or may be, seen and inspected before the risk is assumed, and its construction, situation, and ordinary hazards as well

appreciated by the underwriter as the owner. In marine insurance the under-writer, from the very necessities of his undertaking, is obliged to rely upon the assured, and has therefore the right to exact a full disclosure of all the facts known to him which may in any way affect the risk to be assumed. But in fire insurance no such necessity for reliance exists, and, if the under-writer assumes the risk without taking the trouble to either examine or in-quire, he cannot very well, in the absence of all fraud, complain that it turns out to be greater than he anticipated. And so are the latest and best authori-ties."

In Massachusetts, in the earlier authorities, the stringent rule of marine insurance as to concealments was declared applicable with all its rigor to fire policies. In Curry v. Insurance Co., 10 Pick. 535, it was held that if the assured did not communicate facts within his knowledge which increased the risk, though he was not questioned concerning them, and though he supposed the facts not to be ma-terial, the policy was void. This can hardly be reconciled with the later cases in the same court. In Washington Mills Emery Manuf'g Co. v. Weymouth B. Mut. Fire Ins. Co., 135 Mass. 503, the question was whether a failure to state that the insured did not own the land on which the buildings stood avoided the policy. No fraud appeared. The court said:

"The defendant saw fit to issue this policy without any specific inquiries of the plaintiff as to the title to the land, and without any representations by the plaintiff upon this point. It was its own carelessness, and it cannot avoid the policy without proving intentional misrepresentation or concealment on the part of the plaintiff. An innocent failure to communicate facts about which the plaintiff was not asked will not have this effect"; citing Com. v. Hide & Leather Ins. Co., 112 Mass. 136; Fowle v. Insurance Co., 122 Mass. 191; Walsh v. Association, 127 Mass. 383.

Nor does Chief Justice Shaw's definition of "concealment" in a fire insurance case seem to be as broad as that prevailing in marine insurance. In Daniels v. Insurance Co., 12 Cush. 416, he said, in defining the term as used in a fire policy (page 425):

"'Concealment' is the designed and intentional withholding of any fact material to the risk, which the assured, in honesty and good faith, ought to communicate to the underwriter. Mere silence on the part of the assured, especially as to some matter of fact which he does not consider it important for the underwriter to know, is not to be considered as such concealment."

There are many other cases of fire insurance in which it is held that a nondisclosure of a material fact not inquired about does not avoid the policy unless it appears to have been withheld with fraud-ulent intent. Alkan v. Insurance Co., 53 Wis. 136, 10 N. W. 91; Van Kirk v. Insurance Co., 79 Wis. 627, 48 N. W. 798; Insurance Co. v. Stultz, 87 Va. 629, 636, 13 S. E. 77; Sanford v. Insurance Co. (Wash.) 40 Pac. 609; Pelzer Manuf'g Co. v. St. Paul F. & M. Ins. Co., 41 Fed. 271.

The number of life insurance cases in which the question has arisen is small. In Rawls v. Insurance Co., 27 N. Y. 287, the court of ap-peals held that, where an applicant for life insurance fully and truly answered all questions put to him by the company, the mere omission to state matter, though material to the risk, would not be a concealment, and would not affect the validity of the policy, because the applicant might presume that the insurer had questioned him on

all subjects which he deemed material.    In Mallory v. Insurance Co., 47 N. Y. 52, 57, the same court sustained a charge to the jury, that, if the applicant did not conceal any fact which, in his own mind, was material in making the application, the policy was not void.    See, also, Cheever v. Insurance Co., 4 Am. Law Rec. 155.    In Vose v. Insurance Co., 6 Cush. 42, the supreme judicial court of Massachusetts announced the principle, as applicable to life policies, that the concealment of a material fact will avoid the policy, though it is the result of accident or negligence, and not of design.    The case did not call for the application of such a principle.    The applicant was asked if he was afflicted with any disease.    He answered that he was not.    At the time he had consumption, and had experienced several of the premonitory symptoms.    His answers were made the basis of the policy.    It is probable that the term "concealment," as used in this case, refers to an incomplete answer to a general question, rather than a failure to volunteer a fact not asked for, because the court uses in the opinion language which is incorporated in the headnote, as follows:

"It is the duty of the insured to disclose all material facts within his knowledge. Although specific questions, applicable to all men, are proposed by the insurers, yet there may be particular circumstances affecting the individual to be insured, which are not likely to be known to the insurers; and the concealment of a material fact, when a general question is put by the insurers, at the time of effecting the policy, which would elicit that fact, will vitiate the policy."

But, whatever the effect of this case, we think the modern tendency, even of Massachusetts decisions, is to require that a nondisclosure of a fact not inquired about shall be fraudulent, before vitiating the policy; and, as already stated, this view is founded on the better reason.    The subject is by no means as clear, upon the authorities, as could be wished, and the text writers find much difficulty in reconciling the cases.    May, Ins. (3d Ed.) §§ 202, 203, 207. We hold that the charge of the circuit court upon this question was correct.

It is also objected that the court was wrong in charging the jury that the burden of proof to establish the materiality of the misrepresentation or concealment, as well as the fraudulent intent, where that was necessary, was upon the defendant.    Unquestionably, this is the general rule.    2 Greenl. Ev. (15th Ed.) § 398; Tidmarsh v. Insurance Co., 4 Mason, 439, 441, Fed. Cas. No. 14,024; Fiske v. Insurance Co., 15 Pick. 310; Jones v. Insurance Co., 61 N. Y. 79; Insurance Co. v. Ewing, 92 U. S. 377; Insurance Co. v. Brown, 57 Miss. 308.    It is urged for the defendant, however, that, because it was admitted that Schardt made an untrue answer concerning his other insurance, the presumption was that his failure to mention it was intentional, and that the court should have so instructed the jury.    Had the defendant requested such a charge, the question would then have been presented for decision.    But, instead of requesting such an instruction, defendant framed a single charge, which instructed the jury that they should presume, not only that the failure to mention the fact was intentional, but

also that it was material. This was erroneous, and the court rightly refused to give it. But we do not think that the defendant was entitled to the instruction that the admission that Schardt had a policy in the New York Life Insurance Company, and failed to mention it, raised the presumption that his omission was intentional, or—what is the same thing—that it was fraudulent. There is a natural, and perhaps a legal, presumption of the continuance of a state of knowledge as of the state of sanity or marriage, and, it being admitted that Schardt once knew that he had taken this policy for $5,000, that he continued to know, and so remembered that he had the policy when he answered the question as to other insurance. But the presumption is not conclusive. Men do forget entirely a fact previously known to them, and they do forget it temporarily, so that they may make an untrue statement inadvertently about it, though recently known to them. The possibility or probability of their doing so depends on the character of the fact in question, and all the circumstances under which the misstatement concerning it is made. There is also a presumption that a man does not make a fraudulent misstatement, but men frequently do nevertheless make such statements; and the question whether the presumption is overcome depends on the evidential weight to be given to all the circumstances, including possible motive, together with the positive evidence of witnesses. The two presumptions in this case covered the same ground, and were conflicting. Neither was conclusive, and it was for the jury to determine from all the circumstances what the truth was. It would seem proper that an instruction referring to one of these presumptions should also refer to the other, and should point out the duty of the jury to weigh the facts and circumstances in the light of both. Nothing here said, however, is intended to measure the duty of the court in instructing the jury as to presumptions from particular facts when other facts and circumstances affecting the weight of the presumption, or rebutting it, appear in the case, or when other and conflicting presumptions may also have application to possible phases of the evidence. It is, and must be, largely within the discretion of the court, even when a special instruction on the subject is requested, to determine in such case whether it is useful to call the attention of the jury to presumptions from particular facts at all, when such presumptions do not shift, as between the parties, "the duty of going forward with the evidence," as it is sometimes called. Instructions as to such presumptions are more or less in the nature of comment on the evidence, the scope of which is always within the discretion of the trial court. For the error already referred to in the exclusion of evidence, the judgment of the circuit court is reversed, with instructions to order a new trial.