[File No. 6304.]

JOSEPH THOMAS, Respondent, v. NEW YORK LIFE INSURANCE COMPANY, a Corporation, Appellant.

(260 N. W. 605.)

626

Opinion filed May 4, 1935.

*Dullam & Young,* for appellant.
*C. H. Starke,* for respondent.

BURKE, Ch. J.   This is an action for damages for an alleged breach of an insurance policy.   The appeal is from the judgment rendered in

favor of the plaintiff and against the defendant for damages for the total and permanent disability of the plaintiff from the commencement of his disability throughout the term of his life expectancy on the theory that there has been an anticipatory breach of the contract of insurance against disability on the part of the defendant.

The policy covered the life of the plaintiff and included a total and permanent disability clause, by the terms of which, upon due proof of total or permanent disability, the defendant agreed to waive payment of premium and to pay to the insured the sum of twenty dollars per month. The policy was issued on the 25th day of March, 1929 and on March 3, 1933 the plaintiff offered proof of total disability and the defendant, upon receipt of the proof, made an investigation of the condition of the plaintiff's health at the time he signed the application and made certain representations concerning his health and on the 20th day of June, 1933 the defendant mailed to the plaintiff a notice rescinding the permanent disability clause of the insurance policy upon the ground of misrepresentation made by the plaintiff in his application for insurance. The attempted rescission relates only to the disability and double indemnity benefits expressly excluded from the incontestable provisions and excepting the disability and double indemnity provisions the policy is in full force and effect.

The defendant returned to plaintiff the premiums paid for the permanent disability insurance and the plaintiff, refusing to accept the same, brought an action for breach of the insurance contract. The case was tried to a jury and at the close of all the testimony a motion, by the defendant, for directed verdict was overruled and judgment was entered for the plaintiff upon the verdict returned by the jury, from which judgment the defendant appeals.

The misrepresentations, upon which the defendant relies for a rescission of the total and permanent disability clause in the insurance policy, are the answers to the questions in the application as follows, to wit:

"8. Have you ever consulted a physician or practitioner for or suffered from any ailment or disease of

"A. The Brain or Nervous System? No.

"B. The Heart, Blood Vessels or Lungs? No.

"C. The Stomach or Intestines, Liver, Kidneys or Bladder? No.

"D. The Skin, Middle Ear or Eyes? No.

"9. Have you ever had Rheumatism, Gout or Syphilis? No.

"10. Have you ever consulted a physician or practitioner for any ailment or disease not included in your above answers? No.

"11. What physicians or practitioners, if any, not named above, have you consulted or been examined or treated by within the past five years? None."

Just above the signature of the plaintiff to the application for insurance and printed in red ink appears the following, namely: "On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the company believing them to be true shall rely and act upon them."

The policy states: "This contract is made in consideration of the application therefor and of the payment in advance of the sum of $78.50." After the term "The Contract," there appears in the policy the following: *"The Policy and the application therefor, copy of which is attached hereto, constitute the entire contract.* (Italics are ours.) All statements made by the Insured shall, in the absence of fraud, be deemed representations and not warranties, and no statement shall avoid the Policy or be used in defense to a claim under it, unless it is contained in the written application and a copy of the application is indorsed upon or attached to this Policy when issued." A copy of the application is attached to the policy and made a part thereof.

Section 6501, Compiled Laws 1913, provides: "No oral or written misrepresentation made in the negotiation of a contract or policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching, unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increased the risk of loss." The following §§, Compiled Laws 1913, apply to insurance contracts, viz.:

Section 6480: "A neglect to communicate that which a party knows and ought to communicate is called a concealment."

Section 6481: "A concealment, whether intentional or unintentional, entitles the injured party to rescind a contract of insurance."

Section 6492: "The language of a representation is to be interpreted by the same rules as the language of contracts in general."

Section 6500: "The materiality of a representation is determined by the same rules as the materiality of a concealment," and the materiality of a concealment, under § 6484, "is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due in forming his estimate of the disadvantages of the proposed contract or in making his inquiries."

Section 6498: "A representation is to be deemed false when the facts fail to correspond with its assertions or stipulations."

Section 6499: "If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time when the representation becomes false."

Section 6482: "Each party to a contract of insurance must communicate to the other in good faith all facts within his knowledge which are or which he believes to be material to the contract and which the other has not the means of ascertaining and as to which he makes no warranty."

Section 6483: "Neither party to a contract of insurance is bound to communicate information of the matters following, except in answer to the inquiries of the other:

"1. Those which the other knows.

"2. Those which in the exercise of ordinary care the other ought to know and of which the former has no reason to suppose him ignorant.

"3. Those of which the other waives communication.

"4. Those which prove or tend to prove the existence of a risk excluded by a warranty and which are not otherwise material; and,

"5. Those which relate to a risk excepted from the policy and which are not otherwise material."

The applicant represented that he had not consulted a physician or practitioner or suffered from any ailment or disease of the brain or nervous system, the heart, blood vessels or lungs, the stomach or intestines, liver, kidneys or bladder, the skin, middle ear or eyes; that he never had rheumatism, gout or syphilis; that he had not consulted a physician or practitioner for any ailment or disease not included in any of the

above answers and that he had not consulted any physician or practitioner within the past five years.

The record shows that on the 13th day of July, 1919, he applied to the War Risk Bureau for disability benefits, stating:

"Nature and extent of disability claimed—Defective hearing. 15%.

"Date disability began—Existed prior to enlistment."

That on the 24th day of September, 1921, he again applied to the War Risk Bureau for disability benefits stating that the disability claimed "troubled with eyes, hearing and rheumatism." Disability began "October 17, 1918. After-effects influenza in France. Cause of disability—After-effects of influenza in France. Received treatment at Base Hospital No. 38, Haire Court, France."

Report of Dr. Anderson of Glendive, Montana, under date of November 12, 1921, on examination of claimant for disability benefits, "States brief history of claimant's disability during service: Influenza at Alsace Sector, Oct. 7, 1918. Hospital # 339. . . . At hospital at Haire Court for 5 weeks. There was much watering from the eyes since. Much Rheumatism in joints and much deafness ever since, no earache, no discharge from ears. Present complaint: Complains of stiffness and pain in joints most of the time and worse during cold and damp weather. Unable to read more than 15 minutes, after this time eyes blur and smart a great deal. Does not hear well. Ears do not ache or discharge. Joints do not swell. Physical examination: Claimant looks sick. Just returned from hospital, here for appendectomy. The eyes show some redness of conjunctivae. The nose and mouth are negative. Throat negative. The ears show no discharge, some defect in hearing can be noticed but no signs of discharge from external ears. The chest is negative as is also the heart; and abdomen shows a scar as if for recent appendectomy. Joints of left hand at this time is painful. Diagnosis: Otitis media, chronic, catarrhal, suspected. Chronic arthritis, mild."

Report of Dr. V. T. Moore made to the War Risk Bureau gave brief history of claimant during service: Influenza Oct. 1918. Alsace Sector 349. Transferred to Haire Court Hospital, does not remember number. Hospital 1 month. Hearing, eyes and teeth trouble him after leaving Hospital and for the rest of the service. Rheumatism followed Influenza and continued throughout service. Also reported

rheumatism at time of discharge. Since Discharge rheumatism, decayed teeth, deafness and blurring of eyes when reading.

Report of Dr. Morrison, who made the following report to the War Risk Bureau in 1922: Eyes—Hyperopic Astigmatism. Ears—Chronic Otitis Media Catarrhal Bilateral. Nose—Deflected Septum Hypertrophis Rhinitis, Membrane dry and red and angry looking. Throat—Pharyngitis, dry and red. Report of Dr. Morrison shows 21 treatments and 3 examinations.

Dr. Richards reported "Florid, healthy appearing man. Somewhat neurotic, reflexes active. Thyroid just palpable, no tremor. Chest well developed, lungs normal. Heart apex in fifth space, just within nipple line. Faint cardio respiratory murmur after exercise. Rate standing 74, lying 68, after exercise 115, two minutes 80." Dated March 29, 1922.

On the 17th of March, 1930, Dr. L. O. Carey, Regional Medical Officer, reported to the War Risk Bureau, that plaintiff said: "Present complaint: My heart. It flutters if I walk fast or do any hard work." On physical examination: "Heart is slightly enlarged and percusses 15 cm. When recumbent, a systolic murmur is heard at the third left interspace, and P2 is much accentuated. There is also a short rough presystolic murmur at the apex. When recumbent after exercise, the sounds are all intensified, and a diastolic murmur is also heard at the apex, along with the presystolic murmur. Diagnosis: V. H. D. Mitral Stenosis, compensated (fair)."

In the report of Dr. E. R. Edson, examiner United States Veterans' Bureau, under date of April 17, 1930, plaintiff stated "Since my last Bureau contact, Nov. 12, 1921, I have been treated in no hospitals. During that time I have been treated by Dr. J. A. Malerich, Richardton, North Dakota, 1928–1929, for about three weeks all told for heart trouble. I suffer from palpitation, dizzy when I stoop I nearly fall over, shortness of breath, feel all choked up. There is an ache inside near the heart. Black spots before eyes on sudden exertion. I cannot hear well in the right ear, when I catch cold I notice a humming in the right ear, no pain or discharge. When I read a paper for 10 or 15 minutes I have to stop as the letters get blurred and my eyes hurt." In the report of Dr. Edson of the 17th of April, 1930 in the history of claimant, he states: "Rheumatism, Scarlet Fever, Tonsilitis,

Syphilis, Gassing—Influenza. Symptoms: Percordial pain. Giddiness, Palpitation, Cough, Dyspnoea, Fainting."

In the report of Dr. J. L. Ballou, under date of the 17th of April, 1930, there appears in the history of claimant's health "Eyes injured by flu 1918. Hearing became impaired following flu 1918. Present complaint: Defective vision. Defective hearing right. Humming in the right ear when suffering from colds. Diagnosis: 1155 Otitis media, chronic, catarrhal, right. 0417 Deviation of nasal septum, slight. 1174 Ametropia, correctable."

Under date of December 31, 1932 he applied for admission to the Veterans' hospital at Fargo, North Dakota and was admitted.

Respondent claims that all the facts, the medical history and findings relating to the respondent are in the depositions of certain officials connected with the Veterans' Administration at Fargo and are not authenticated by the persons who made the record; that they were offered as public records under an exception to the hearsay rule.

The claim is made that they are not public records. The depositions contain statements alleged to have been made by the insured to the Veterans' Administration in which he claims to have been suffering from deafness and from rheumatism. The doctors who filled out the reports, which are offered and received as public records, were never in court, nor were they subjected to the safe-guard of cross examination. They were not under oath. That the records or documents are not public records or public documents and their admission was a violation of the hearsay rule.

The objection to the introduction of the testimony was overruled and the records were admitted and received in evidence. The respondent did not appeal and the question of the admissibility of such matter is not properly before the court; but such question has been considered by the Federal Courts.

In his argument, in support of his objection in the trial court, plaintiff's counsel said: "Public records are exceptions to the rule of hearsay evidence, but the publicity of this record is required to be shown. . . . We do not claim that they are privileged because we have waived any privilege." Thus, it is admitted that if the records are public records they are admissible.

The plaintiff consented, in writing, to the use of the records and

the defendant procured the order of the court, as required by the rules of the director of the Bureau of War Risk Insurance, for the taking of depositions. There is no claim that the law and the rules were not complied with. The claim is that the records were not public and therefore not admissible in evidence.

The waiver of all privilege, by the plaintiff, his consent to the use of the records and the procuring of the order of the court for the taking of the deposition, took from the records all privilege, so far as their use in this case is concerned.

In the case of Chytracek v. United States (D. C.) 60 F. (2d) 325, it is held that the records in the Veterans' Bureau, containing information concerning the physical condition of World War Veterans, are public or quasi-public documents.

In the case of Long v. United States (C. C. A. 4th) 59 F. (2d) 602, the court said: "So far as the report of an examining physician in cases of this character relates to physical facts and his diagnosis of insured's ailment, we think it should be admitted, either in behalf of the insured or in behalf of the United States, on the principles approved in the Wescoat Case (C. C. A. 4th) 49 F. (2d) 193, supra. It falls clearly within the principles under which exceptions to the hearsay rule are admitted; i. e., necessity and circumstantial guaranty of trustworthiness. 2 Wigmore, Ev. §§ 1420 et seq. and vol. 3, §§ 1630–1636. As to trustworthiness, it is made by an official of the government in the regular course of duty, who presumably has no motive to state anything but the truth, and it is made to be acted upon, and is acted upon, in matters of importance by officials of the government in the discharge of their duties. It is made, moreover, as a professional matter by a member of a learned and honorable profession in whom the sense of professional pride, as well as the sense of his official duty, is conducive to truth and accuracy. . . . everyone with experience in conducting litigation knows that as a matter of fact such reports are more reliable than the memory of the witnesses who made them, . . . The written record of an examination made at the time is undoubtedly more trustworthy than the treacherous memory of a busy man dealing with many cases having many points of similarity. It is clear, therefore, not only that it is necessary as a practical matter that these reports be received if evidence is to be had of the matters

to which they relate, but also that they are more dependable than would be the oral testimony of the witnesses who made them, and are, in reality, the best evidence obtainable as to such matters.

"It is objected that the reports are not made under oath, and that there is no opportunity afforded for cross-examining the physicians when the reports are received. As to the first point, what we have said about circumstantial guaranty of the trustworthiness is a sufficient answer. As to the second, it has no more force here than when asserted against the admission of any record entry. . . .

"And the reports, in so far as they relate to the observations and diagnoses of the examining physicians, are admissible on the further ground that they are public records made and preserved by public officials in discharge of duties imposed upon them by law. Evanston v. Gunn, 99 U. S. 660, 25 L. ed. 306; McInerney v. United States (C. C. A. 1st) 143 F. 729; 3 Wigmore, Ev. §§ 1630–1636. . . . In Third Nat. Bank & T. Co. v. United States (C. C. A. 6th) 53 F. (2d) 599, 601, . . . the court said, . . . 'The basis of these exceptions is that the obligation of the officer, coupled with his lack of personal interest, gives to his findings a sufficient guaranty of trustworthiness to admit them in evidence.'

"In the case of United States v. Cole (C. C. A. 6th) 45 F. (2d) 339, 341, the court said: 'Further, we regard these reports as exceptions to the hearsay rule. They were made by the examining physicians under the sanction of official duty and as and for a permanent record of specific facts to be kept in the files of the Bureau.' " To the same effect, Third Nat. Bank & T. Co. v. United States (C. C. A. 9th) 53 F. (2d) 599; United States v. Cole (C. C. A. 6th) 45 F. (2d) 339; United States v. Wescoat (C. C. A. 4th) 49 F. (2d) 193; United States v. Stamey (C. C. A. 9th) 48 F. (2d) 150; Runkle v. United States (C. C. A. 10th) 42 F. (2d) 804; Seattle Title Trust Co. v. United States (D. C.) 49 F. (2d) 818; Massey v. United States (D. C.) 46 F. (2d) 78; Stout v. United States (D. C.) 51 F. (2d) 815; United States v. Blackburn (C. C. A. 9th) 53 F. (2d) 19; 1 Greenl. Ev. 16th ed. § 483; Jones, Commentaries on Ev. 2d ed. § 1700; Wigmore, Ev. §§ 1632–1636.

In the case of Evanston v. Gunn, 99 U. S. 660, 25 L. ed. 306, the records of meteorological stations were held admissible in evidence,

such reports being of a public character, and made in pursuance of public duty. McInerney v. United States (C. C. A. 1st) 143 F. 729, supra.

In the case of Lado v. First Nat. L. Ins. Co. — La. App. —, 158 So. 872, the records in a charity hospital were held to be admissible in evidence.

In State v. Hall, 16 S. D. 8, 91 N. W. 325, 65 L.R.A.(N.S.) 151, the records of a postmaster were admitted in evidence to show that a certain money order issued by the postoffice at Hartford was cashed at the Tarkio postoffice.

The Federal decisions are all based on the broad ground that the doctor making the report is an officer of the War Risk Bureau; that the reports are made in the line of duty and therefore are presumed to be correct and are exceptions to the hearsay rule.

Dr. Campbell, assistant medical director of the New York Life Insurance Company, advisor concerning the medical aspect of applications for life insurance and the administrative duties incidental to that work, testifying on behalf of the defendant said that he was familiar with the usages and practices of life insurance companies generally in their handling of applications for new insurance in the year 1929 and that life insurance companies generally, in the year 1929, considered the representations made in plaintiff's application material.

In answer to a hypothetical question, including the questions and answers in the application for insurance, the information given by respondent to the War Risk Insurance Bureau, in his application for disability benefits, the reports of examinations given the respondent by the Veterans' Bureau on his application for benefits including all the ailments of respondent as enumerated in such reports, Dr. Campbell testified that it was the usage and practice of life insurance companies generally in such circumstances in the year 1929 to decline such application until they had an opportunity to investigate fully the details of the various illnesses, because the impairment of vision and the impairment of hearing, when apparently chronic and prolonged, as in this case, have a tendency to become permanent and to grow worse as the individual grows older. The rheumatism, described as having occurred several times over a period of years, also has a tendency to become chronic and to grow worse as the individual grows older and chronic

arthritis is liable to lead to diseases of the heart. Respondent testified: "Dr. Mallerich wrote the answers to the questions in the application. I answered the questions that he asked me and the answers are correct as far as I knew at that time."

"Q. One question was asked here as follows: 'What physicians or practitioners, if any, not named above, have you consulted or been treated or examined by within the last five years,' and the answer is: 'None.' Had you been treated by or consulted a physician during the five years just preceding that application for insurance?

"A. Yes. . . . By Dr. Mallerich. . . . The last of December 1928. . . . About three months or so before the application was made. I had a severe cold and a high fever. I was in bed about two or three days. The inflammation of the joints I had in 1921 left me about five months after that and to my knowledge I have not suffered with it since."

The testimony of Dr. Dahl and Dr. Neville on behalf of the plaintiff shows that when he applied for benefits under the insurance policy he was suffering from heart trouble. Dr. Neville testified "When I examined Mr. Thomas the first time I got his history and his history was quite indicative of heart trouble. . . . I found his heart was in just such condition as we would expect from his history. His heart was enlarged. It was beating faster than normally. . . . He had what we call a dilated heart. The final diagnosis was enlargement of the heart, due to diseased heart muscles. . . . Arthritis is rather a general term. . . . Rheumatism would not cause the condition but acute rheumatic fever would. . . . It has got to be a specific rheumatic fever with Arthritis before we would consider that it would damage the heart.

"Q. Did the history of this patient as he gave it, show any rheumatic fever?

"A. It did not."

It is the contention of the defendant that the court erred in not granting the motion for directed verdict made at the close of all of the testimony.

We have quoted certain sections of the insurance law for the purpose of showing the requirement of the utmost good faith between the parties to the insurance contract. There must be no concealment of

material matters which affect the risk. Each party to the contract must disclose to the other, in good faith, all facts within his knowledge which are, or which he believes to be, material to the contract and which the other party has not the means of ascertaining. Certain matters, as designated in § 6483, the parties are not bound to disclose, except in answer to inquiries of the other party, but even in such case, when the inquiries are asked, concerning such matters, the party asked is bound to disclose truthfully whatever information he has and if he fails and the concealment increases the risk of loss the contract may be rescinded.

In 1895 the civil code was re-enacted and Chapter 65 of said code, relating to insurance, was amended by including § 4485, Revised Code, 1895, viz.: "No oral or written misrepresentation made in the negotiation of a contract or policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching, unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increased the risk of loss." This provision has been introduced into the insurance statutes of many states and it is well settled that the purpose is to prevent the cancelation of insurance policies upon some mere technicality, which is immaterial and really does not affect the contract.

It was first before this court in the case of Satterlee v. Modern Brotherhood, 15 N. D. 92, 106 N. W. 561, Judge Engerud, speaking for the court, said: "That section is part of the article dealing with concealments and representations in insurance contracts. . . . If we assume that the language of this provision includes representations which have been made as warranties, the act, nevertheless, leaves untouched the law as it previously existed with respect to the effect of an untrue warranty as to a fact, the existence or nonexistence of which increased the risk of loss. If the matter misrepresented increased the risk of loss, it is still wholly immaterial whether the matter was intentionally or innocently misrepresented."

It was next considered in the case of Soules v. Brotherhood of American Yeomen, 19 N. D. 23, 120 N. W. 760, in which Judge Morgan, for the court, said: "In Satterlee v. Modern Brotherhood, 15 N. D. 92, 106 N. W. 561, the section was referred (to), but a consideration of it was held unnecessary."

It will be observed, however, that in the Satterlee case, Judge Engerud said: "If we assume that the language of this provision includes representations which have been made as warranties, the act, nevertheless, leaves untouched the law as it previously existed with respect to the effect of an untrue warranty as to a fact, the existence or nonexistence of which increased the risk of loss." In other words, the representation in the Satterlee case was a warranty and if the statute applied to warranties and there was an untrue warranty as to matter, which increased the risk of loss, it avoided the policy irrespective of whether the matter was intentionally or innocently misrepresented.

In the Soules case, supra, the representations also were warranties and Judge Morgan continued as follows: "It will be noticed that this section applies only to misrepresentations if its language cannot be made to include warranties by a liberal construction of its provisions. The contents of the certificate of insurance and of the application were couched in such language that there is no room for contention that the answers to certain questions were not made warranties. . . . We are satisfied that it was the legislative intention that all misrepresentations should be without effect unless made with intent to defraud or unless the risk was increased by reason of any misrepresentations. . . . We reach the conclusion that said section should be construed to include warranties for these reasons: First, because such construction is within the language of the section. All false warranties are included within the word 'misrepresentations.' In the second place, the statute is remedial in its evident purpose. It is a matter of common knowledge that insurance policies have often been rendered of no benefit on account of the fact that misstatements as a matter of fact immaterial were made warranties by the contract. It must have been the intention of the Legislature to effectuate some change by the enactment of this statute. If it be construed to apply only to misrepresentations as understood in insurance law, then no material change was made from the law as it existed before § 5934 was enacted."

In support of this conclusion is cited a statement from a Massachusetts case as follows: "Misstatements of fact, whether the statement is said to be by the parties a warranty or a representation, are equally misrepresentations, and are placed in each case upon the same footing by the statute which applies to them if the statements are called war-

ranties by the parties no less than if they are mere representations." White v. Provident Sav. Life Assur. Soc. 163 Mass. 108, 39 N. E. 771, 27 L.R.A. 398; Jenkins v. Covenant Mut. L. Ins. Co. 171 Mo. 375, 71 S. W. 688.

Massachusetts has practically the same statute but it mentions and includes warranties in express terms and in the case of Everson v. General Acci., F. & L. Assur. Corp. 202 Mass. 169, 88 N. E. 658, the court said: "It prohibits the parties to an insurance contract from attaching to a breach of a warranty the effect of defeating all rights of the insured under the policy, unless in good conscience it ought to have this result, either as increasing the risk or made with intent to deceive. . . . Being remedial legislation the statute must be liberally construed."

There is nothing ambiguous about the statute. It applies to all misrepresentations. An untruthful statement in a warranty is a misrepresentation and therefore the language "misrepresentations" applies to all representations, whether they were formerly understood in the insurance law as warranties or representations. This statute wipes out the distinction and under it no misrepresentations will defeat or avoid the policy unless it is, first: a misrepresentation, made with actual intent to deceive; or second: a misrepresentation which increases the risk of loss.

The first question to determine is the materiality of the representations. In the instant case the questions asked of the applicant and his answers thereto are a part of the contract. The applicant testified that the questions were asked of him and that he gave the answer and he signed the statement declaring that "I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the Company believing them to be true shall rely and act upon them."

The policy states specifically that "The Policy and application therefor, copy of which is attached hereto, constitute the entire contract." A copy of the application is attached to the policy and actually a part of the contract and hence becomes as material as any other part of the contract.

Under § 6492, Compiled Laws 1913, "The language of a representa-

tion is to be interpreted by the same rules as the language of contracts in general."

Under § 5901, Compiled Laws 1913, "The whole of a contract is to be taken together so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."

Under § 5898, Compiled Laws 1913, "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity."

That part of the policy which includes the application and the representation therein is couched in explicit, clear language and the statement therein that "no statement shall avoid the policy or be used in defense to a claim under it, unless it shall be contained in the written application and a copy of the application shall be indorsed upon or attached to this policy when issued," means that all statements made by the insured which are not in the written application and attached to the policy shall not defeat the policy because they are no part of the contract. They are specifically excepted from the contract, but all representations made in the answers are included and such representations are material because a part of the contract.

The record shows, in the instant case, that the representations in the application are untrue. The sworn applications to the Veterans' War Risk Bureau show that the respondent had suffered with ear and eye trouble; that he had rheumatism; that he had consulted a physician for ailments or diseases not included in his answers and that he had consulted and had been treated by a physician within five years before the application, in fact within about three months prior to the application; but materiality and untruthfulness are not sufficient to defeat or avoid the policy, unless the questions were answered with intent to deceive or the representations increased the risk of loss. In other words, representations, which are made a part of the insurance contract, and are untrue, are grounds for rescission, first: when they are made with intent to deceive, and second: when they increase the risk of loss, regardless of intent.

Section 6501 must be read in connection with § 6481. A concealment, intentional or unintentional, entitles the injured party to rescind the contract of insurance.

This leaves the questions, were the misrepresentations in the insur-

ance policy made with intent to deceive or if not made with intent to deceive do they increase the risk of loss?

In the case of Penn Mut. L. Ins. Co. v. Mechanics' Sav. Bank & T. Co. (C. C. A. 6th) 72 F. 413, 38 L.R.A. 33, Judge Taft, in a very learned opinion construed a Pennsylvania statute similar to ours, which provides that "no misrepresentation or untrue statement in such application, made in good faith by the applicant shall effect a forfeiture or be a ground of defense in any suit brought upon any policy of insurance issued upon the faith of such application unless such misrepresentation or untrue statement relate to some matter material to the risk." The latter part of this section, namely: "unless such misrepresentation or untrue statement relate to some matter material to the risk" it would seem means the same as the latter portion of § 6501, namely: "unless the matter misrepresented increased the risk of loss," for under the Pennsylvania statute the matter could not be material to the risk without increasing the risk of loss.

Judge Taft quotes from the decision in the case of Hermany v. Fidelity Mut. Asso. 151 Pa. 17, 24 A. 1064, as follows: "This act has effected a change in life insurance contracts,—a much-needed change so far as some companies are concerned. The questions of materiality and good faith are ordinarily questions of fact, and therefore for the jury. They were certainly so in this case." "The evident purpose of this legislation was to strike down, in this class of cases, literal warranties, so far as they may be resorted to for the disreputable purpose of enforcing actually immaterial matters. It provides a rule of construction for the purpose of preventing injustice, and it is as much the duty of courts to enforce such rules as it is to administer the statute of frauds and perjuries."

Judge Taft continuing, said: "Where the parties have not, by the terms of the application and policy, impliedly stipulated that each subject inquired about shall be material, the question whether a fact is material to the risk is always a question for the jury. Now, but for the statute of Pennsylvania . . . the provisions of the policy here in suit would certainly render the answer to each question of the application material, with all the consequences thus imposed by the law of insurance; but, as already stated, it was the chief purpose of the statute to destroy such conventional materiality, and to open to judicial

investigation the question on its merits.  Much reliance is had by counsel for plaintiff in error on the language of Mr. Justice Gray in Phœnix Mut. L. Ins. Co. v. Raddin, 120 U. S. 183, 189, 30 L. ed. 644, 646, 7 S. Ct. 500, where, in delivering the opinion of the court, he said: 'Whether there is other insurance on the same subject, and whether such insurance has been applied for and refused, are material facts, at least, when statements regarding them are required by the insurers as part of the basis of the contract.'

"In support of this are cited the following cases:  Carpenter v. Providence Washington Ins. Co. 16 Pet. 495, 10 L. ed. 1044; Jeffries v. Economical Ins. Co. 22 Wall. 47, 22 L. ed. 883; Anderson v. Fitzgerald, 4 H. L. Cas. 484, 10 Eng. Reprint, 551; Macdonald v. Law Union F. & L. Ins. Co. L. R. 9 Q. B. 328; Edington v. Ætna L. Ins. Co. 77 N. Y. 564; id. 100 N. Y. 536, 3 N. E. 315.  In each one of these cases it will be found that by the terms of the policy the application and its answers were made the basis of the contract, and the question and answer concerning other insurance gave that fact a contractual materiality.  The same thing is true of the other cases cited by counsel for the plaintiff in error:  Bowditch Mut. F. Ins. Co. v. Winslow, 3 Gray, 415, 431; Ryan v. Springfield, F. & M. Ins. Co. 46 Wis. 671, 674, 1 N. W. 426; Byers v. Farmers' Ins. Co. 35 Ohio St. 606, 614, 35 Am. St. Rep. 623; Cooper v. Farmers' Mut. F. Ins. Co. 50 Pa. 299, 88 Am. Dec. 544; Hartford F. Ins. Co. v. Small (C. C. A. 5th) 66 F. 490, 494; Bard v. Penn Mut. F. Ins. Co. 153 Pa. 257, 261, 25 A. 1124, 34 Am. St. Rep. 704; Mitchell v. Lycoming Mut. Ins. Co. 51 Pa. 402; Obermeyer v. Globe Mut. Ins. Co. 43 Mo. 573, 576; Hutchinson v. Western Ins. Co. 21 Mo. 97, 101. . . . The circuit court of appeals of the Third circuit has had occasion quite recently to consider when the materiality of a fact is for the jury, and, in a clearly-stated opinion, Judge Wales shows that it is always for the jury, unless the answers in the application are expressly made the basis of the contract."  Fidelity & C. Co. v. Alpert (C. C. A. 3d) 67 F. 460.

"A misrepresentation as to the health or a serious disease in answer to specific questions, the statements being made a part of the policy, stipulated to be true and the basis of the contract, binds the insured to correct answers; otherwise the policy will be void, even though the statements be inadvertently or innocently made, and whether designedly

untrue or undesignedly so; and this, even though the examining physician of the company reports favorably as to the risk, after personal examination." 4 Couch, Ins. § 885, p. 2938.

In the case of Mack v. Pacific Mut. L. Ins. Co. 167 Minn. 53, 208 N. W. 410, the Minnesota court said: "If the evidence is conclusive in establishing a misrepresentation within the spirit of the law, as above stated, a question of law is presented. In Flikeid v. New York L. Ins. Co. 163 Minn. 127, 203 N. W. 598, and Shaughnessy v. New York L. Ins. Co. 163 Minn. 134, 203 N. W. 600, . . . we held that the defense was established as a matter of law."

In the case of Volunteer State L. Ins. Co. v. Richardson, 146 Tenn. 589, 244 S. W. 44, 26 A.L.R. 1270, the Tennessee court held: "Whether or not untrue answers in an application for life insurance are such as to increase the risk of loss is a question of law for the determination of the court. . . . False answers by an applicant for insurance that he does not use intoxicating liquor materially increase the risk of loss so as to avoid the policy issued upon such application."

In the case of Minsker v. John Hancock Mut. L. Ins. Co. 254 N. Y. 333, 173 N. E. 4, 81 A.L.R. 829, it is held that representations in an application for life insurance that the applicant has had no medical attention in the five years preceding and has never received or applied for treatment at any hospital, dispensary, sanitarium, cure, or other institution, are material to the risk, so that their falsity invalidates the policy. The court said: "The answers to questions 14 and 15 as written and annexed to the policy establish as a matter of law that they are material to the risk. The plaintiff is bound by the answers as written, since the application was physically annexed to the policy of insurance, which she received from the insurer. Being a part of the policy, the statements in the application had at least the effect of erroneous and material representations under the rule at common law." Bollard v. New York L. Ins. Co. 98 Misc. 286, 162 N. Y. S. 706; id. 182 App. Div. 915, 168 N. Y. S. 1102; Travelers Ins. Co. v. Pomerantz, 246 N. Y. 63, 158 N. E. 21; Stanulevich v. St. Lawrence Life Asso. 228 N. Y. 586, 127 N. E. 315.

In the case of Union Indem. Co. v. Dodd (C. C. A. 4th) 21 F. (2d) 709, 55 A.L.R. 735, the court said: "Upon the question of whether the materiality of a representation was a question for the court, or for

the jury, the Virginia court has said: 'Whether a representation is made and the terms in which it is made are questions of fact for the jury; but, when proved, we are of the opinion that its materiality is a question for the court.' Metropolitan L. Ins. Co. v. Hayslett, 111 Va. 107, 68 S. E. 256. This construction seems to have been consistently followed by the Virginia court. New York L. Ins. Co. v. Franklin, 118 Va. 418, 87 S. E. 584; North River Ins. Co. v. Atkinson, 137 Va. 313, 119 S. E. 46."

It is well settled that when the application is made the basis of the contract and is attached to and made a part of the policy, as in this case, the materiality of the questions and answers in the application are questions for the court and in this case they were material to the risk.

On the question of proof that the misrepresentations increased the risk of loss, Judge Taft, continuing, said in Penn. Mut. L. Ins. Co. v. Mechanics' Sav. Bank & T. Co. (C. C. A. 6th) 72 F. 413, 38 L.R.A. 33: "The better authorities, however, seem to sustain the rule that the insurance experts may testify concerning the usage of insurance companies generally in charging higher rates of premium or in rejecting risks, when made aware of the fact claimed to be material. . . . A fact is material to an insurance risk when it naturally and substantially increases the probability of that event upon which the policy is to become payable. Materiality of a fact, in insurance law, is subjective. It concerns rather the impression which the fact claimed to be material would reasonably and naturally convey to the insurer's mind before the event, and at the time the insurance is effected, than the subsequent actual causal connection between the fact, or the probable cause it evidences, and the event. . . . A fair test of the materiality of a fact is found, therefore, in the answer to the question whether reasonably careful and intelligent men would have regarded the fact, communicated at the time of effecting the insurance, as substantially increasing the chances of the loss insured against. The best evidence of this is to be found in the usage and practice of insurance companies in regard to raising the rates or in rejecting the risk on becoming aware of the fact. If the rates are not raised in such a case, it may be inferred that reasonably careful men do not regard the fact as material. If the rates are raised, or the risk is rejected, then they do."

In 4 Couch on Insurance, § 829, the rule is stated as follows:

"Broadly speaking, the test is, Did the fact or circumstance represented or misrepresented operate to induce the insurer to accept the risk, or to accept it at a less premium? If it offers a false inducement which is acted upon in either case, the insurer being misled or deceived, the representation is material, and this if the truth would have disclosed a fact increasing or materially changing the risk as understood and agreed upon to be taken, or if, had the truth been known, the insurer, acting in accordance with the usual custom or practice of insurance companies, would have materially modified the terms of the contract, or have rejected the risk or charged a higher premium, or if the representation was calculated to mislead and does mislead; it being assumed, however, that the insurer is governed by the rules governing prudent and intelligent underwriters in practice in like cases." Columbian Ins. Co. v. Lawrence, 2 Pet. 25, 7 L. ed. 335; Carpenter v. American Ins. Co. (C. C.) 1 Story, 57, Fed. Cas. No. 2,428; Holloman v. Life Ins. Co. (C. C.) 1 Woods, 674, Fed. Cas. No. 6,623; Nicoll v. American Ins. Co. 3 Woodb. & M. 529 (C. C.) Fed. Cas. No. 10,259; Clason v. Smith (C. C.) 3 Wash. C. C. 156, Fed. Cas. No. 2,868; Mulville v. Adams (C. C.) 19 F. 887; Miller v. Maryland Cas. Co. (C. C. A. 3d) 193 F. 343; Mutual L. Ins. Co. v. Hilton-Green (C. C. A. 5th) 211 F. 31. Citing Alabama, Dakota, Georgia, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas, Vermont, Virginia, Washington, England and Ireland. A good statement of the test is found in the case of Mascott v. First Nat. F. Ins. Co. 69 Vt. 116, 37 A. 255, namely: Any fact is material the knowledge or ignorance of which would materially influence the insurer in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of insurance.

Couch continues as follows: "This general rule is not altered, even where the loss arises from causes totally unconnected with the material fact misrepresented or concealed, because a true disclosure of the fact might have led the company to decline the insurance, or accept it only at a higher premium. In fact, every fact untruly asserted or wrongfully suppressed must be regarded as material if the knowledge or ignorance of it would naturally influence the judgment of the underwriter in making the contract at all, or in estimating the degree and character of the

risk, or in fixing the rate of premium." Washington L. Ins. Co. v. Box Co. 185 N. C. 543, 117 S. E. 785.

One of the best definitions that we have as to what constitutes a material question is laid down in Jeffries v. Economical L. Ins. Co. 22 Wall. 47, 22 L. ed. 833, where the court said: "But if, under any circumstances, it can produce a reply which will influence the action of the company, the question cannot be deemed immaterial."

In the case of Great Eastern Casualty Co. v. Collins, 73 Ind. App. 207, 126 N. E. 86, it was held that a representation by the insured in his application for accident insurance, that he had received no indemnity from any other company, when at the time he made such representation he had received indemnity at least six times, was such a false and fraudulent representation as to avoid the policy. The court said: "Certainly appellant would not have issued the policy involved had it been informed that appellee was so careless of his own personal safety."

The Kentucky statute is, in effect, practically the same as the statute in North Dakota and in the case of Provident Sav. Life Assur. Soc. v. Whayne, 131 Ky. 84, 93 S. W. 1049, the court said: "The insurer has the right to know certain facts relevant to the risk he is asked to assume, so that he can determine in his own mind whether he will, for the consideration paid, undertake them. To deceive him into believing one thing, which is material to the risk, by fraudulent misrepresentation, or by misrepresentation at all, is to bind one in a voluntary contract against his will and contrary to his express agreement. . . . In life insurance, it may well be supposed that it is material to the risk whether the insured has ever had or even been treated for rheumatism, sciatica, eczema, or diabetes. It is not possible, even in the presence of many symptoms, for even expert medical men to diagnose one's condition. It is even less certain what the result of the disease which the symptoms represent may be. But if the symptoms are not present, appearances are most apt to deceive the examiner, although disease may undoubtedly be present in a latent form. If, however, shortly or frequently before the date of the application and examination, the person had been ill of certain diseases, and had been treated therefor by physicians, the fact of such illness, its duration and history, might shed light upon its present condition. They are all, at least, relevant matters, which may cer-

tainly interest the prospective insurer as bearing upon the advisability of taking the risk offered. For the same reason, in part, the action of other insurance companies of whom the applicant had sought insurance, in rejecting his application for cause, is a pertinent fact, bearing on the advisability of writing the risk. . . . They are matters the insurer has a right to be informed of. As it acts upon the information given it, and which is sought for that purpose, it must follow that, if the information is concerning a matter material to the risk, and is substantially not true, the insurer ought not to be bound upon it." On the test of materiality the court quotes with approval the test as defined by Judge Taft heretofore quoted.

In Mengel v. Northwestern Mut. L. Ins. Co. 176 Pa. 280, 35 A. 197, the evidence shows that during the five years preceding the death of the insured a doctor had attended the insured for vomiting and nausea, the effect of over drinking and had even attended him within four months preceding the application. The court held the facts showed breach of material warranties as to require the court to pronounce upon it as a matter of law. To the same effect is Grand Fraternity v. Keatley, 4 Boyce, 308, 88 A. 553; Lutz v. Metropolitan L. Ins. Co. 186 Pa. 527, 40 A. 1104.

In the case of Prudential Ins. Co. v. Ashe, 266 Mich. 667, 254 N. W. 243, the Michigan court said: "There is another ground, not expressly relied upon in the pleadings or arguments, on which plaintiff's bill for the cancellation of this policy may be sustained. Section 12444 of 3 Comp. Laws 1929 provides: 'The falsity of any statement in the application for any policy covered by this chapter shall not bar the right to recovery thereunder unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer.'" This is, in effect, the North Dakota statute. Continuing the court said: "An insurance policy may be canceled for an untrue statement made in good faith or even in ignorance of its falsity, if such misrepresentation materially affected the assumption of risk by the insurer. National Life & Acci. Ins. Co. v. Nagel, 260 Mich. 635, 245 N. W. 540. See also Bellestri-Fontana v. New York L. Ins. Co. 234 Mich. 424, 208 N. W. 427. Defendant's past and existing state of health was a material fact affecting the risk of plaintiff company, and plaintiff's officers have

testified in a statement admitted by stipulation and unrebutted by the defendant that defendant's application for reinstatement would not have been accepted had a full disclosure been made to the company.

"The decree below will be reversed and the case remanded for the entry of a decree canceling the reinstatement of the policy."

In the case of Scott v. New England Mut. L. Ins. Co. 127 Neb. 724, 256 N. W. 910, the insured had a life policy and a supplemental agreement provided for the payment of $50 each month, if permanent disability occurred. Action was brought to recover the monthly allowance for permanent disability and the court said: "It should be clearly kept in mind that the defendant is meeting no attack upon the two life insurance policies of $5,000 each, based upon the application in which the untrue answers appear, but is only seeking to defend against a recovery against the total and permanent disability riders attached thereto.

". . . In this and other cases it is material to examine the question whether, if a true answer had been made, the policy of insurance would have been written." Souza v. Metropolitan L. Ins. Co. 270 Mass. 189, 170 N. E. 62; Cooley, Briefs on Ins. 3293; Stanulevich v. St. Lawrence Life Asso. 228 N. Y. 586, 127 N. E. 315; Kaffanges v. New York L. Ins. Co. (C. C. A. 1st) 59 F. (2d) 475; Joseph v. New York L. Ins. Co. 219 Ill. App. 452; Metropolitan L. Ins. Co. v. Jennings, 130 Md. 622, 101 A. 608; Mutual L. Ins. Co. v. Long, 12 Ohio App. 252, 31 Ohio C. A. 49; Seaback v. Metropolitan L. Ins. Co. 274 Ill. 516, 113 N. E. 862; Wingo v. New York L. Ins. Co. 155 S. C. 206, 101 S. E. 653. See Mutual Ben. Health & Acci. Asso. v. Ratcliffe, — Va. —, 175 S. E. 870.

In the case of Barrase v. Metropolitan L. Ins. Co. 12 N. J. Mis. R. 631, 174 A. 165, the New Jersey court held that irrespective of fraud or knowledge by insured of her true condition, recovery could not be had upon the life policy if insured, contrary to policy conditions, was not in sound health when the policy was issued and within two years before issuance thereof insured had been attended by physician for pulmonary tuberculosis. McAuliffe v. Metropolitan L. Ins. Co. 93 N. J. L. 189, 107 A. 258; Prahm v. Prudential Ins. Co. 99 N. J. L. 288, 122 A. 752; Orsini v. Metropolitan L. Ins. Co. 9 N. J. Mis. R. 407, 154 A. 201.

Insurer's liability under life policy depends upon actual condition

of insured's health when it was issued within condition in policy requiring sound health. Palyo v. Western & S. L. Ins. Co. 114 Pa. Super. Ct. 583, 174 A. 640; Jones v. Travelers' Protective Asso. (C. C. A. 4th) 70 F. (2d) 74; Gardner v. North State Mut. L. Ins. Co. 163 N. C. 367, 79 S. E. 806, 48 L.R.A.(N.S.) 714, Ann. Cas. 1915B, 652; Hurt v. New York L. Ins. Co. (D. C.) 41 F. (2d) 392.

Respondent relies upon the case of O'Keefe v. Zurich General Acci. & Liability Ins. Co. (C. C. A. 8th) 43 F. (2d) 809, 73 A.L.R. 298. There is a clear distinction between the O'Keefe Case and the instant case. The O'Keefe Case was a distinct kind of accident insurance technically called "special professional coverage," particularly designed to insure highly skilled professionals, such as dentists, to whose work the unimpaired use of the hands is essential, against the hazard of dismemberment of the hands and the fingers of the hands. In such a case the general health of the insured might not be material to the risk in an insurance policy against dismemberment, but in the instant case respondent is insured against disability considered total whenever the insured is so disabled by bodily injury or disease that he is wholly prevented from performing any work, from following any occupation or from engaging in any business for remuneration or profit. In such case the health of the applicant is very material. The court, in the O'Keefe Case, pointed out the distinction, 43 F. (2d) 809, on page 811. The court said: "Remembering that the hazard insured against is *dismemberment,* can it be said that the hazard necessarily was increased by the rejection at some time in the past of an application, for example, for life insurance? . . . Must it not be determined in each case from all the facts, including the fact concealed, whether the risk has been increased."

In the O'Keefe Case it does not appear that the application was made a part of the policy. In the instant case, the application is made the basis of the contract, is attached to and made a part of the policy and the questions and answers are just as material as any other part of the contract. They are made material by the parties. Their materiality is not a question of fact but a question of law; but on the record in this case if the application had not been made the basis of the contract and a part of it, the representations are material to the risk.

Section 6501 was included in chapter 65 of a bill for an act entitled

the Civil Code in 1895. The entire law relating to insurance was re-enacted as chapter 65, which includes § 6484. Every section relating to insurance is a part of the same chapter and all sections must be read and construed together. Section 6500 provides: "The materiality of a representation is determined by the same rule as the materiality of a concealment." Section 6484, relating to concealments provides: "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due in forming his estimate of the disadvantages of the proposed contract or in making his inquiries."

The question as to the materiality then is, What is the probable and reasonable influence of the fact of a concealment upon the party to whom the communication is due in forming his estimate of the disadvantages of the proposed contract or in making his inquiries? And the rule is made to apply to representations the same as to concealments.

The question as to whether matters misrepresented in an application for an insurance policy increased the risk of loss may be a question of law and as a defense, insurance experts may testify concerning the usages of insurance companies generally in charging higher rates of premium or in rejecting risks when made aware of the facts claimed to be material and if it is proven that the insured, in answer to questions concerning his health, gave false answers and the insurance experts testify that if true answers had been given insurance companies generally would not have accepted the risk and it appears from the records that reasonable minds must agree that the matter misrepresented increased the risk of loss, it then becomes a question of law for the court.

Applying these rules to the instant case, the applicant was asked if he had ever consulted a physician or practitioner for or suffered from any ailment or disease of the brain or nervous system, the heart, blood vessels or lungs, the stomach or intestines, liver, kidneys or bladder, the skin, middle ear or eyes and his answer was "no" to each question, although he had had a great deal of trouble with both ears and eyes, as shown by his sworn application to the War Risk Bureau. The report of Dr. Richards, exhibit F, made in March, 1922, shows he had faint cardio respiratory murmur after exercise, at that early date. The report of Dr. Morrison, of Billings, Montana, under date of January 30, 1921, shows treatments furnished, 21, total number of examina-

tions, 3; report of physical examination of Dr. Carey, Regional Medical Officer of Portland, Oregon, under date of March 17, 1930, shows heart slightly enlarged, when recumbent a systolic murmur is heard at the third left interspace. The report of Dr. Edson, examiner for the United States Veterans' Bureau, shows brief outline of claimant's history: "Since my last Bureau contact, Nov. 12, 1921, I have been treated in no hospitals. During that time I have been treated by Dr. J. A. Malerich, Richardton, North Dakota, 1928–1929, for about three weeks all told for heart trouble. I suffer from palpitation, dizzy when I stoop I nearly fall over, shortness of breath, feel all choked up. There is an ache inside near the heart. Black spots before eyes on sudden exertion. I cannot hear well in the right ear, when I catch cold I notice a humming in the right ear, no pain or discharge. When I read the paper for 10 or 15 minutes I have to stop as the letters get blurred and my eyes hurt." This history was given in March 1930 by insured and it shows that he was treated for heart trouble before he applied for insurance. The insurance policy was issued the 25th day of March 1929. He is asked "Have you ever had Rheumatism, Gout or Syphilis? Have you ever consulted a physician or practitioner for any ailment or disease not included in your above answer?" And to each question he answers "No." The history as he gave it in all of his examinations shows that he had arthritis, trouble with his ears and eyes, that his joints were stiff, that he suffered from stiff joints, especially during damp and cold weather and that he was treated for heart trouble by Dr. J. A. Mallerich in 1928 and 1929 and had cardio murmurs as early as 1922.

It is admitted that the answer to question 11 is not true, namely: "What physicians or practitioners, if any, not named above, have you consulted or been examined or treated by within the past five years?" Answer: "None."

Plaintiff testified that about three months before he made application for insurance he had a severe cold and fever, was in bed two or three days. Dr. Mallerich treated him at that time and after he was up he said he saw the doctor two or three times. The record shows that the answers to subdivision D of question 8 and to question 9 are also untrue.

"8. Have you ever consulted a physician or practitioner for or suffered from any ailment or disease of . . .

"D. . . . The Middle Ear or Eyes. A. No.

"9. Have you ever had Rheumatism . . .? A. No.

In his second sworn application for disability benefits to the Bureau he states that the nature and extent of disability claimed—"troubled with eyes, hearing and rheumatism." Cause of disability—"after effects of influenza in France."

"Did you receive treatment at any army hospital?

"A. Yes, at Base Hospital # 38, Haire Court, France."

According to his own sworn statement he had suffered from trouble with his ears and eyes and had rheumatism for which he was treated in a hospital in France. The report of Dr. Morrison shows three examinations and twenty-one treatments. From his testimony and admission at the trial, independent of the other records, it is proven that his answers to questions 11, 9 and subdivision D of question 8 are untrue.

On this record it would seem that reasonable minds could not differ on the answer to the question: Did the matter misrepresented by the plaintiff in his application for insurance increase the risk of loss? The record shows that it did and that it was the usage and practice of life insurance companies generally to decline such application until they had an opportunity to investigate the details of the illness. Early examinations of the applicant showed heart murmurs and heart trouble is the cause of the present permanent disability. The history of his health indicates heart trouble and certainly if the insurance company had had truthful answers to all the questions asked, it would have been to the interest of the company to have declined the application.

The plaintiff claims that Dr. Mallerich, who wrote the plaintiff's answers to the questions in the application for insurance, is the same Dr. Mallerich who was his physician in his sickness some three months before he applied for insurance and that the notice to the doctor was notice to the company.

The plaintiff testified that John Hoerner was the local agent at Richardton to whom he applied for insurance and Dr. Campbell, assistant medical director of the New York Life Insurance Company, testified that he knew what authority Dr. Mallerich had and that Dr. Mallerich's

authority was limited to reporting and recording carefully the answers to the medical examination, to witness the applicant's signature and to make a careful physical examination and report the findings on the medical report.

Where a medical examiner's authority is limited to filling in the answers of the applicant to the questions in the application for insurance, to the making of a physical examination and report of the findings on the medical report, knowledge of the applicant's health previously acquired in treating such applicant as a patient is not notice to or binding on the company. Leonard v. State Mut. Life Assur. Co. 24 R. I. 7, 51 A. 1049, 96 Am. St. Rep. 698; Gregg v. Baldwin, 9 N. D. 515, 84 N. W. 373; National Fraternity v. Karnes, 24 Tex. Civ. App. 607, 60 S. W. 576; Foot v. Ætna L. Ins. Co. 61 N. Y. 571; Caruthers v. Kansas Mut. L. Ins. Co. (C. C.) 108 F. 487.

A great many states have statutes making the medical examiner, or physician acting as such, the agent of the insurance company and estopping such company from setting up as a defense that the insured was not in the condition of health required by the policy at the time of the delivery thereof, but there is no such statute in this state. Dr. Mallerich was not the local agent and his authority was limited to the examination and the making of the certificate. There is no evidence that he represented the insurance company in any way at the time he treated the plaintiff and any information which he may have acquired at that time is not notice to the insurer.

In his answers to questions in the application for insurance the plaintiff misrepresented matters which increased the risk of loss and it follows that the disability benefits were properly cancelled and the judgment must be and is reversed.

BURR, NUESSLE, MORRIS and CHRISTIANSON, JJ., concur.